678 A.2d 100

BALTIMORE COUNTY, Maryland

v.

WESLEY CHAPEL BLUEMOUNT ASSOCIATION, et al.

No. 1369, Sept. Term, 1995.

Court of Special Appeals of Maryland.

June 27, 1996.

586

588

Douglas N. Silber, Asst. County Atty. (Virginia W. Barnhart, County Atty. and Linda T. Cox, Asst. County Atty., on the brief), Townson, for Appellant.

J. Carroll Holzer (Holzer and Lee on brief), Towson, for appellee, Wesley Chapel.

G. Scott Barhight (Whiteford, Taylor & Preston, L.L.P., on brief), Towson, for appellee, Gaylord Brooks Realty Co.

Argued before FISCHER, DAVIS and HOLLANDER, JJ.

HOLLANDER, Judge.

This appeal requires us to interpret provisions of the Open Meetings Act ("the Act"), codified at Maryland Code, §§ 10–501 to 10–512 of the State Government Article (1984, 1995 Repl.Vol.) ("S.G."). Pursuant to S.G. § 10–503(b)(2), the Act is applicable to a public body when it meets to consider "a special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, or *any other zoning matter.*" (Emphasis added). The question here is whether a county board of appeals's consideration of a subdivision and development plan constitutes a meeting to consider a "zoning matter" within the meaning of the Act. The Circuit Court for Baltimore County concluded that it was. As we disagree, we shall reverse.

Gaylord Brooks Realty Co., Inc. ("Brooks"), appellee, a developer, submitted a concept plan to the Baltimore County Department of Public Works for a subdivision and development in northeastern Baltimore County, which was approved by a hearing officer. Two community associations, the Wesley Chapel Bluemount Association and the Manor Area Association, and various individuals who owned property in the vicini-

ty of the development site,[1] appellees (hereinafter referred to collectively as "Wesley Chapel"), appealed this decision to the Baltimore County Board of Appeals (the "Board"). At the conclusion of that hearing, the Board declined Wesley Chapel's request that it publicly deliberate. It later issued a written opinion affirming the decision of the hearing officer.

Thereafter, Wesley Chapel sought review in the circuit court. Contemporaneously, Wesley Chapel filed against Baltimore County ("the County"), appellant, the Board, and the Baltimore County Executive, a petition to enforce the Act. With leave of court, Brooks intervened. After a hearing on cross-motions for summary judgment, the trial judge concluded that the Board violated the Act by failing to deliberate in public. Accordingly, the court voided the Board's action and remanded the case to the Board for further proceedings in open session. The court also ordered the County to pay attorneys' fees to Wesley Chapel. The court did not address the merits of the Board's decision affirming the hearing officer.

The County now appeals and presents four issues for our consideration:

I. Does the statutory language of the Open Meetings Act of Maryland reflect the intention of the General Assembly to limit the application of the statute to zoning cases, as opposed to all types of land use cases, where the language of the statute specifically excludes land use matters other than a "special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation or any other zoning matter"?

II. Does the public body "meet" within the parameters of the Open Meetings Act when, after having heard oral argument in an appeal from the hearing officer's decision approving a plan of subdivision development, the panel

---

1. The named individuals are Harry and Helen McCarty, Robert and Sylvia Eppig, Robert and Sue Dieter, Darlene Wells, Katherine Powers, James Curd, David Smith, Adrienne Burgoyne, Randall Stockett, Alexandra Secor, and Charles and Annette Shawgo.

members: (1) agree, without further discussion, that the panel chairman shall draft a written opinion, as required by law; (2) the panel chairman circulates the draft to the other members who, without further discussion, agree that the draft opinion represents their views of the appeal; and (3) without further discussion, a final draft is prepared which each panel member signs?

III. Are the appellees entitled to attorneys' fees, even assuming, *arguendo*, that the Board of Appeals met privately to consider a zoning matter in violation of the provisions of the Maryland Open Meetings Act?

IV. Assuming, *arguendo*, that the Board of Appeals met privately to consider a zoning matter in violation of the provisions of the Open Meetings Act, should this Court affirm the circuit court decision to invalidate effectively the resultant proceedings and opinion by the Board of Appeals?

In addition, although it did not note a cross-appeal, Brooks has asked us to reach the merits of the Board's decision affirming the hearing officer. Wesley Chapel opposes that request.

We conclude that the hearing officer's approval of Brooks's subdivision and development plan did not constitute a "zoning matter" within the meaning of S.G. § 10–503(b)(2). Therefore, the Board's consideration of that matter was not subject to the Act. Accordingly, we shall reverse the judgment of the circuit court. Our conclusion makes it unnecessary for us to consider the County's remaining issues. We shall also decline to consider Brooks's contentions, because the circuit court did not consider the merits of the appeal. Moreover, because Brooks failed to note a cross-appeal, Wesley Chapel has not had an opportunity to brief the issues that Brooks has raised.

## FACTUAL SUMMARY

In June 1993, Brooks filed its concept plan with the County Department of Public Works. The plan proposed a subdivision and development to be known as "Wesley Chapel Woods," with thirty-three single-family houses to be constructed on a

rural parcel of land in northeastern Baltimore County, approximately 172.7 acres in size. At the time of the proceedings, the land was undeveloped and heavily forested. The vast bulk of the property was zoned R.C.4, with a small portion zoned R.C.2.[2]

In August and October, 1993 community input meetings were held with respect to Brooks's concept plan. After the second meeting, Brooks submitted a development plan for the site, and a development plan conference was later conducted.

At a public hearing[3] in June 1994, Wesley Chapel appeared in opposition to the development plan. The protestants raised a plethora of issues. They contended that a Baltimore County zoning regulation required the performance of a groundwater study and that no such study had been performed. They also claimed that the plan could not proceed until the County Council adopted guidelines to implement "Bill 113–92," a set of new zoning regulations that it had enacted in 1992. Additionally, they asserted that the area set aside under the plan for a "conservancy area" was too small,[4] and that the density of the

---

2. "R.C.–4" is the "Resource Conservation—Watershed Protection" zone. *See* Baltimore County Zoning Regulations (hereinafter, "B.C.Z.R.") § 1A03. The zone is intended "to provide for the protection of the water supplies of metropolitan Baltimore and neighboring jurisdictions by preventing contamination through unsuitable types or levels of development in their watersheds." B.C.Z.R. § 1A03.1.

"R.C.–2" is the "Resource Conservation—Agricultural" zone. *See* B.C.Z.R. § 1A01. This zone is intended "to foster conditions favorable to a continued agricultural use of the productive agricultural areas of Baltimore County by preventing incompatible forms and degrees of urban uses." B.C.Z.R. § 1A01.1B.

3. Section 26–206 of the County Code governs "development plan approval." Section 26–206(a) provides, in part: "Final action on a plan shall be after a public quasi-judicial hearing before the hearing officer. The hearing shall be conducted on any comment or proposed or requested condition which remains unresolved."

4. B.C.Z.R. § 101 defines a "conservancy area" as "[t]he portion of a rural cluster development which contains significant natural or historic features and which has been dedicated through deed restriction and

proposed lots was too great. Further, they attacked the application of County Bill 113–92 to the facts of the case, arguing that it "fails miserably" in its attempt "to protect and preserve R.C.4 zoned property," because it allowed more density of lots on the proposed site than would have been permitted under the R.C.4 regulations. The protestants also raised other contentions pertaining to vegetative clearing, the sufficiency of the local roads and infrastructure, septic and well design, storm water management, the content of the conservancy deed, and concerns involving a historical area, signage, lights, noise, and compatibility.

In a written opinion dated July 7, 1994, the hearing officer approved most of the development plan, although he imposed some restrictions.[5] The hearing officer identified himself as a "zoning commissioner" beneath the space in which he signed his name.

Wesley Chapel subsequently appealed to the Board,[6] which heard argument from counsel on August 31, 1994.[7] At the conclusion of the hearing, counsel for Wesley Chapel asked the Board to deliberate in public, pursuant to the Act. In support of his request, counsel submitted a copy of a letter from the Baltimore County People's Counsel, dated August 4, 1994,

---

easements for continued farming, forestry or open space use in order to remain largely undisturbed."

5. Section 26–206(o) of the County Code provides, in relevant part: "In approving a plan, the hearing officer may impose such conditions, as may be deemed necessary or advisable based upon such factual findings as may be supported by evidence for the protection of surrounding and neighboring properties."

6. Section 26–209(a)(1) of the County Code provides, in relevant part: "Any person aggrieved or feeling aggrieved by final action on a plan may appeal to the county board of appeals within thirty (30) days after the date of the final decision of the hearing officer."

7. Section 26–209(c) of the County Code provides: "The board shall conduct a proceeding under this section by hearing oral argument of the parties and by receiving written briefs, if requested by any party to the proceeding. At the board's discretion, additional evidence and testimony may be allowed."

advising that the Act applied to hearings concerning development plans.[8] Nevertheless, the Board denied the request.

On September 15, 1994, the Board issued its opinion, affirming the decision of the hearing officer. It stated that "the decision to approve the plan is supported by competent, material and substantial evidence, and that the record does not reflect in any manner that the Hearing Officer acted in any arbitrary or capricious manner, or exceeded his statutory authority, or committed any error of law." [9]

The Board also explained its denial of the request for public deliberations.

The appeal that is being heard by the Board is a development plan appeal which was before the Hearing Officer and not the Zoning Commissioner for Baltimore County. No zoning petitions (i.e., special exceptions, variances, special hearings) were filed with the development plan; hence, there is no zoning matter before the Board in these proceedings. This Board has previously ruled that appeals of development plans to this Board are not subject to the open meetings law unless they involve "other zoning matters." It is pointed out that an open hearing was conducted on the record before this Board with regard to the appeal filed in this matter; however, this Board concludes that Section 10–

---

**8.** The People's Counsel is an official appointed by the County Executive to "represent the interests of the public in general in zoning matter[s]." Baltimore County Charter § 524.1.

**9.** Section 26–209(d) of the County Code provides:
In a proceeding under this section, the board may:
(1) Remand the case to the hearing officer;
(2) Affirm the decision of the hearing officer; or
(3) Reverse or modify the decision if a finding, conclusion, or decision of the hearing officer:
a. Exceeds the statutory authority or jurisdiction of the hearing officer;
b. Results from an unlawful procedure;
c. Is affected by any other error of law;
d. *Is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or*
e. *Is arbitrary or capricious.*
(Emphasis supplied).

503(b) does not apply as to the deliberation process since the Board is hearing a development plan appeal as opposed to a zoning matter appeal.

Thereafter, Wesley Chapel sought judicial review in the circuit court. It also filed a petition to enforce the Act, in which it sought a declaration that the Act applied to the Board's action. The petition and the appeal were consolidated. At the hearing on cross-motions for summary judgment, Wesley Chapel claimed that the Board's consideration of the development plan constituted a hearing on a "zoning matter," within the meaning of S.G. § 10–503(b)(2), and that the Board's failure to deliberate publicly amounted to "an intentional and willful act" performed "with the intention to avoid the application of the State Law concerning open meetings." To support its claim of willfulness, it pointed to an earlier decision of the Circuit Court for Baltimore County that determined that the Board was required to conduct open deliberations in a zoning case.[10] It also sought to void the Board's decision and recover attorneys' fees and costs.

In response, the County contended that the term "zoning matter" in S.G. § 10–503(b)(2) did not apply to a hearing on a development plan. Further, it argued that "[s]ubdivision cases ... are intrinsically different from zoning cases." The County also argued that, even if the Act applied, the Board did not "meet" in violation of the Act, because the Board neither deliberated nor discussed the issues presented in the appeal. In this regard, the County relied on an affidavit from the chairman of the Board, Michael B. Sauer, Esquire, in which he averred that, after the hearing, he and the other two panel members agreed that Sauer would draft an opinion and circulate it to them, which Sauer did. The affidavit also stated that "[n]either Board member expressed any objection or any other comment to the draft other than that it was fine with

---

**10.** The earlier case, *The Valleys Planning Council, et al. v. Baltimore County,* Case No. 93CV3628, involved a petition for a special exception, which is one of the types of zoning matters specifically enumerated in S.G. § 10–503(b)(2).

each," and that "[t]here was absolutely no other discussion of any nature on either the draft or its members." Sauer averred that he had an administrative assistant prepare a final draft of the opinion, and that he then made revisions to correct spelling, grammar, and punctuation mistakes. All three members of the Board signed the final opinion.

Additionally, the County asserted that the court should not void the Board's decision. It stated that (1) any violation on the part of the Board was not a "willful" violation of the Act, which is a precondition to voiding an agency decision under S.G. § 10–510(d)(4),[11] and (2) voiding the decision "would serve no useful purpose because there is no conduct in which the Board engaged that ought to be punished."

The court determined that the Act imposed upon the Board the obligation to deliberate publicly. The trial judge said that "since [the appeal hearing] did involve zoning matters," the Board was "required to hold an open hearing on their deliberations." The court also rejected the County's contention that the Board had not conducted a closed "meeting" because Chairman Sauer had simply prepared and circulated a written opinion and there were no discussions on the issues. In a subsequent order, the court assessed attorneys' fees of $2,387.78 in favor of Wesley Chapel and against the County, representing sixty-five percent of the amount that Wesley Chapel had requested.

## *STANDARD OF REVIEW*

Summary judgment is governed by Rule 2–501, which provides that a court shall enter summary judgment on the motion of a party where "there is no genuine dispute as to any material fact and ... the party is entitled to judgment as a matter of law." Md. Rule 2–501(e). In ruling upon the

---

11. S.G. § 10–510(d)(4) provides that "if the court finds that a public body *willfully* failed to comply with § 10–505, § 10–506, § 10–507, or § 10–509(c) of this subtitle and that no other remedy is adequate," the court may "declare void the final action of the public body." (Emphasis supplied).

motion, the court must view the facts, including all reasonable inferences from those facts, in the light most favorable to the opposing party. *Baltimore Gas and Electric Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307 (1995). The court does not decide disputed facts, but instead makes a ruling as a matter of law. *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993); *General Accident Insurance Co. v. Scott,* 107 Md.App. 603, 611, 669 A.2d 773, *cert. denied,* 342 Md. 115, 673 A.2d 707 (1996). Therefore, the standard of appellate review is whether the trial court was "legally correct." *Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993).

## *DISCUSSION*

### I.

 We must determine whether review of a subdivision development plan constitutes a "zoning matter" within the meaning of the Act.

In resolving this issue, we focus on the text of the Act and the principles of statutory construction. We conclude that the process by which a subdivision development plan is approved is not necessarily a "zoning matter" within the meaning of S.G. § 10–503(b)(2).

We begin with S.G. § 10–501. There, the General Assembly set forth the public policy embodied in the Act:

(a) *In general.*—It is essential to the maintenance of a democratic society that, **except in special and appropriate circumstances:**

(1) public business be performed in an open and public manner; and

(2) citizens be allowed to observe:

(i) the performance of public officials; and

(ii) the deliberations and decisions that the making of public policy involves.

(b) *Accountability; faith; effectiveness.*—(1) The ability of the public, its representatives, and the media to attend, report on, and broadcast meetings of public bodies and to

witness the phases of the deliberation, policy formation, and decision making of public bodies ensures the accountability of government to the citizens of the State.

(2) The conduct of public business in open meetings increases the faith of the public in government and enhances the effectiveness of the public in fulfilling its role in a democratic society.

(c) *Public policy.*—**Except in special and appropriate circumstances when meetings of public bodies may be closed under this subtitle,** it is the public policy of the State that the public be provided with adequate notice of the time and location of meetings of public bodies, which shall be held in places reasonably accessible to individuals who would like to attend these meetings.

(Boldface added; italics in original). Although the Act favors open meetings by public bodies, it is clear that the Legislature has specifically provided in S.G. § 10–501 that it does not apply in "special and appropriate circumstances."

Several other provisions of the Act are relevant to our resolution of the issue presented. S.G. § 10–505 broadly provides: "Except as otherwise expressly provided in this subtitle, a public body shall meet in open session." The parties agree that the Board is a "public body" within the meaning of the statute. *See* S.G. § 10–502(h) (defining "public body"). S.G. § 10–503(a)(1)(iii), which provides an exclusion from the scope of the Act, states: "Except as provided in subsection (b) of this section, this subtitle does not apply to . . . a public body when it is carrying out . . . a quasi-judicial function." S.G. § 10–502(i), in turn, defines the term "quasi-judicial function" as a determination of:

(1) a contested case to which Subtitle 2 of this title [the Administrative Procedure Act] applies;

(2) a proceeding before an administrative agency for which Chapter 1100, Subtitle B of the Maryland Rules would

govern judicial review; [12] or

 (3) a complaint by the [State Open Meetings Law Compliance] Board in accordance with this subtitle.

The parties agree that the Board was exercising a "quasi-judicial function" in this case. But S.G. § 10–503(b) provides an exception to the exemption for public bodies exercising a quasi-judicial function. The exception in S.G. § 10–503(b) is central to this case. It provides:

 The provisions of this subtitle apply to a public body when it is meeting to consider:

 (1) granting a license or permit; or

 (2) a special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, *or any other zoning matter.*

(Emphasis supplied).

Additionally, S.G. § 10–508(c) states: *"The exceptions in subsection (a) of this section shall be strictly construed in favor of open meetings of public bodies."* (Emphasis supplied). But, by its terms, S.G. § 10–508(c) is limited in application to S.G. § 10–508(a). That subsection, in turn, specifies the circumstances when closed sessions are permitted (such as meetings to consider the investment of public funds, meetings with counsel, collective bargaining negotiations, etc.). S.G. § 10–508(c) thus does not apply when, as here, an exception or exclusion not set forth in S.G. § 10–508(a) is alleged to apply.

 The fundamental goal of statutory construction is to ascertain and effectuate the intention of the Legislature. *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995). The primary source for determining legislative intent is the language of the statute. *In re Douglas P.,* 333 Md. 387, 392, 635 A.2d 427 (1994); *Vest v. Giant Food Stores, Inc.,* 329 Md. 461, 466, 620 A.2d 340 (1993). We will read the statute in a natural

---

12. S.G. § 10–502(i) refers to review under "Subtitle B" of the Maryland Rules. In 1993, the provisions of Subtitle B were rescinded and transferred to Subtitle 2 of Title 7 of the Rules.

and sensible fashion, assigning the words of the statute their ordinary and commonly understood meanings, absent evidence that the General Assembly intended a different meaning. *Board of Trustees of Maryland State Retirement and Pension Systems v. Hughes,* 340 Md. 1, 7, 664 A.2d 1250 (1995); *In re Roger S.,* 338 Md. 385, 391, 658 A.2d 696 (1995).

"[W]hen there is no ambiguity or obscurity in the language of the statute, there is no need to look elsewhere to ascertain the intent of the legislative body." *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994). In the absence of an ambiguity, the courts " 'are not at liberty to disregard the natural import of words with a view towards making the statute express an intention which is different from its plain meaning.' " *Fikar v. Montgomery County,* 333 Md. 430, 434–35, 635 A.2d 977 (1994), quoting *Potter v. Bethesda Fire Department,* 309 Md. 347, 353, 524 A.2d 61 (1987). When the language of the statute is ambiguous, however, courts must look beyond the words of the statute and to other evidence of legislative intent. *Gargliano v. State,* 334 Md. 428, 438–39, 639 A.2d 675 (1994). The court should then consider, " 'not only the literal or usual meaning of the words, but [also] their meaning and effect in light of the setting, the objectives and purpose of the enactment.' " *Whack v. State,* 338 Md. 665, 672, 659 A.2d 1347 (1995), quoting *Gargliano,* 334 Md. at 436, 639 A.2d 675. We may thus "consider the consequences resulting from one meaning, rather than another, and adopt the ·construction which promotes the most reasonable result in light of" the statute's purpose. *Rucker v. Comptroller of the Treasury,* 315 Md. 559, 565, 555 A.2d 1060 (1989). In all cases, however, "[c]are must be taken to avoid construing a statute by forced or subtle interpretations." *Houston v. Safeway Stores, Inc.,* 109 Md.App. 177, 184, 674 A.2d 87 (1996). *See also In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 557, 640 A.2d 1085 (1994) ("A plainly worded statute must be construed without forced interpretations designed to limit its application.").

Nor will we read a statutory provision in isolation. Rather, we must consider the statutory scheme as a whole, as well as the purpose of the statute. *Department of Public Safety and Correctional Services v. Howard,* 339 Md. 357, 369, 663 A.2d 74 (1995); *Ward v. Department of Public Safety and Correctional Services,* 339 Md. 343, 351–52, 663 A.2d 66 (1995); *Outmezguine v. State,* 335 Md. 20, 41, 641 A.2d 870 (1994). Moreover, when there is a specific statutory provision on point, a court has no choice but to apply the specific provision, rather than the general one. *See Snyder v. State,* 189 Md. 167, 170, 55 A.2d 485 (1947) (courts must determine legislative intent from the language of the statute at issue, and not from any general statement of policy). *See also Department of Economic and Employment Development v. Taylor,* 108 Md. App. 250, 276, 671 A.2d 523 (1996) (only the specific grounds for disqualification from unemployment benefits may be used to deny claimant's entitlement to benefits, and not the general policy provision; incongruities between the general policy provision and the disqualification provision may be eliminated only by the Legislature).

The issue here focuses on the meaning of the word "zoning." As we have noted, Wesley Chapel contends that review of a development plan constitutes a "zoning matter." Quoting the People's Counsel, Wesley Chapel states: "Like many words, the word 'zoning' may have particular meaning in various contexts. Historically, it is a generic term virtually synonymous with land use law." Accordingly, Wesley Chapel asserts that "[z]oning means planning, zoning, and subdivision regulations." (Italics omitted).

We disagree. In our view, the term "zoning" has a specific and commonly understood meaning in the eyes of the law. Although the concepts of "zoning" and subdivision control are related and even cross paths at times, they are nonetheless separate and distinct. The review of a subdivision development plan is not, in and of itself, a "zoning matter" within the meaning of S.G. § 10–503(b)(2).

"Zoning by its definition is 'the division of a city or town by legislative regulation into districts and the prescription and application in each district of regulations having to do with structural and architectural designs ... and ... use [of] buildings.' " *Neufeld v. City of Baltimore,* 863 F.Supp. 255, 260 (D.Md.1994), *aff'd without published opinion,* 70 F.3d 1262 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1852, 134 L.Ed.2d 952 (quoting BLACK'S LAW DICTIONARY 1618 (2nd ed.1985)). "Zoning" is defined in BLACK'S LAW DICTIONARY 1618 (6th ed.1990) as:

> The division of a city or town by legislative regulation into districts and the prescription and application in each district of regulations having to do with structural and architectural designs of buildings and of regulations prescribing [the] use to which buildings within designated districts may be put. Division of land into zones, and within those zones, regulation of both the nature of land usage and the physical dimensions of uses including height setbacks and minimum area.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976) defines the verb "zone," in relevant part, as "to partition (a city, borough, or township) by ordinance into zones or sections reserved for different purposes (as residence, business, or manufacturing or combinations of these) and governed by appropriate building regulations (as of the height and area of all structures)." *Id.* at 2660.

The Court of Appeals has recognized that the term "zoning" "describe[s] the process of setting aside disconnected tracts of land varying in shape and dimensions, and dedicating them to particular uses designed in some degree to serve the interests of the whole territory affected by the plan." *Applestein v. Mayor & City Council of Baltimore,* 156 Md. 40, 51, 143 A. 666 (1928). " 'The very essence of zoning is territorial division according to the character of the land and the buildings, their peculiar suitability for particular uses, and uniformity of use within the zone.' " *Northwest Merchants Terminal v. O'Rourke,* 191 Md. 171, 190, 60 A.2d 743 (1948), quoting *Heath v. Mayor & City Council of Baltimore,* 187 Md. 296, 305, 49

A.2d 799 (1946). More recently, the Court has stated that "[z]oning provides a tool by which to establish *general* areas or districts devoted to selected uses." *Schultz v. Pritts,* 291 Md. 1, 20, 432 A.2d 1319 (1981) (emphasis supplied). Indeed, the Court has remarked that the devotion of general areas or districts to selected uses is the "purpose" of the zoning law. *Ellicott v. Mayor & City Council of Baltimore,* 180 Md. 176, 181, 23 A.2d 649 (1942). We have also stated that "the function of zoning is to preserve various types of neighborhoods, be they residential, industrial, commercial, or historical." *Montgomery County v. Horman,* 46 Md.App. 491, 497–98, 418 A.2d 1249 (1980).

In contrast, "subdivision control" pertains to land use control. BLACK'S LAW DICTIONARY, *supra,* defines "subdivision" as: "Division into smaller parts of the same thing or subject matter. The division of a lot, tract or parcel of land into two or more lots, tracts, parcels or other divisions of land for sale or development." *Id.* at 1424. Local governments regulate the development of subdivisions, but in a process that is distinct from the notion of "zoning."

Case law recognizes the distinction between zoning and subdivision control. In *Board of County Commissioners of Cecil County v. Gaster,* 285 Md. 233, 401 A.2d 666 (1979), in the course of an extensive discussion of development control, the Court stated: "There are three integral parts of adequate land planning, the master plan, zoning, and subdivision regulations." *Id.* at 246, 401 A.2d 666. It noted further that " 'zoning ordinances are not calculated to protect the community from the financial loss which may result from imperfect development. Some of these purposes are sought through the imposition of subdivision controls.' " *Id.* (quoting 4 R. Anderson, AMERICAN LAW OF ZONING § 23.03 (2nd ed.1977)). The Court also quoted from the report of a commission on the reform of Maryland's planning and zoning laws, which stated that § 3.05 of Article 66B of the Code " 'is designed to assert the full force of the [master] plan as being the foundation upon which *zoning, subdivision, and other land use regulatory*

*devices* shall be constructed.' " *Id.*, 285 Md. at 241, 401 A.2d 666. (Emphasis supplied).

In *Clarke v. County Commissioners for Carroll County,* 270 Md. 343, 311 A.2d 417 (1973), the Court held that a county planning and zoning commission's approval of a subdivision plan, by which the houses proposed for construction were permissible under the applicable zoning regulations, did not constitute a "rezoning" of the land (which would have been a legislative act beyond the commission's authority). The Court stated that the Commission's approval of the plan "was not an 'illegal' rezoning, but merely the approval of a subdivision plan in accordance with Art. 66B, the zoning ordinance and the subdivision regulations." *Id.*, 270 Md. at 350, 311 A.2d 417.

Similarly, courts in other jurisdictions have held, under their local statutes, that boards of zoning appeals do not have the authority to regulate or control the subdivision of land. *See Van Deusen v. Jackson,* 35 A.D.2d 58, 312 N.Y.S.2d 853, 858 (N.Y.App.Div.1970), *aff'd,* 28 N.Y.2d 608, 319 N.Y.S.2d 855, 268 N.E.2d 650 (1971); *Noonan v. Zoning Board of Review of Town of Barrington,* 90 R.I. 466, 159 A.2d 606, 608 (1960). These distinctions necessarily rest upon differences between zoning and subdivision control as land use regulation devices.

The distinction between zoning and subdivision control may also be analogized to the distinction between zoning and "planning," a separate aspect of land use control. In essence, "zoning" pertains primarily to the use of property, whereas "planning" is a broader concept that connotes the development of a community. 101A C.J.S. *Zoning and Planning* § 5 at 34 (1979). *See* BLACK'S LAW DICTIONARY, *supra,* at 880 (defining "land use planning" as a "[g]eneric term used to describe activities such as *zoning, control of real estate developments and use,* environmental impact studies and the like"). The Court of Appeals has acknowledged that the terms "are not synonymous." *Board of County Commissioners of Carroll County v. Stephans,* 286 Md. 384, 389, 408 A.2d 1017 (1979). In *Howard County v. Dorsey,* 292 Md. 351, 362, 438 A.2d 1339

(1982), the Court said that "[t]he zoning function is essentially limited to the establishment of land use districts through the imposition of zoning classifications." "Planning," however,

is a broader term and indicates the development of a community, not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential development and such other matters affecting the public convenience and welfare as may be properly embraced within the police power.

*Stephans,* 286 Md. at 389, 408 A.2d 1017 (quoting 1 E. Yokley, ZONING LAW AND PRACTICE § 1–2 (4th ed.1978)). *See also Washington County Taxpayers Association, Inc. v. Board of County Commissioners of Washington County,* 269 Md. 454, 455–56, 306 A.2d 539 (1973) (discussing difference between planning and zoning; "planning embraces zoning, in a general way, but the converse is not true"); 101A C.J.S. *Zoning and Planning* § 5 at 35 (1979) (" 'Planning' contemplates the evolvement of an overall program or design of the present and future physical development of the total area and services of an existing or contemplated municipality, while 'zoning' is part of an end result or product of planning.").

The case of *Coffey v. Maryland–National Capital Park and Planning Commission,* 293 Md. 24, 441 A.2d 1041 (1982), recognizes the separate nature of zoning, planning, and subdivision control. The Court held that an application for approval of a subdivision plan must be rejected if the plan violates the county's master plan and county regulations require compliance with the master plan, even if the proposed plan complies with applicable zoning regulations. The Court stated: "Subdivision controls are imposed for the purpose of implementing a comprehensive plan for community development. To achieve this end, plats submitted to a planning commission for approval must be examined in relation to the official map and the master plan." *Id.,* 293 Md. at 29–30, 441 A.2d 1041 (quoting 4 R. Anderson, AMERICAN LAW OF ZONING 2D § 23.20 at 89 (1977)). Further, the Court asserted:

If planning boards had no alternative but to rubber-stamp their approval on every subdivision plat which conformed with the zoning ordinance, there would be little or no reason for their existence. While planning and zoning complement each other and serve certain objectives, each represents a separate municipal function and neither is a mere rubber-stamp for the other.

*Coffey*, 293 Md. at 30, 441 A.2d 1041 (citation omitted).

Statutory law also recognizes the distinction between zoning and subdivision control. Maryland Code, Article 28, § 7–101(d) defines "subdivision" in a manner that does not include zoning.[13] Section 7–110 refers to "the exercise of all planning, *zoning, subdivision control,* and all other powers granted in this title." Notably, in Code, Article 66B, which governs "Zoning and Planning," the Legislature enacted separate provisions to govern the powers of zoning and subdivision control. *See* Article 66B, §§ 4.01–4.09 (zoning); Article 66B, §§ 5.01–5.08 (subdivision control).

We must presume that, when the Legislature enacted S.G. § 10–503(b)(2) in 1992, it was aware of the statutes that distinguished zoning and subdivision control. When it used the term "zoning" in S.G. § 10–503(b)(2), the Legislature did not intend the word to serve as a shorthand for all types of land use control. What the Court said in *State v. Bricker*, 321 Md. 86, 93, 581 A.2d 9 (1990), is apt here:

It is presumed that the General Assembly acted with full knowledge of prior legislation and intended statutes that affect the same subject matter to blend into a consistent and

---

**13.** Title 7 governs the Maryland–Washington Regional District. Section 7–101(d) states:

"Subdivision" means the division of a lot, tract, or parcel of land into two or more lots, plots, sites, tracts, parcels, or other divisions for the purpose, whether immediate or future, of sale or building development, and includes resubdivision and, when appropriate to the context, relates to the process of subdivision or to the land or area subdivided. The definition of "subdivision" does not include a bona fide division or partition of exclusively agricultural land not for development purposes.

harmonious body of law.... Therefore, various consistent and related enactments, although made at different times and without reference to one another, nevertheless should be harmonized as much as possible.

See also Cicoria v. State, 332 Md. 21, 43, 629 A.2d 742 (1993) (court presumes that Legislature, when enacting statute, was aware of all other relevant enactments).

Our interpretation is supported by the legislative history of S.G. § 10–503(b)(2). Courts are permitted to consider a statute's legislative history in order to ascertain the Legislature's intent. See Blaine v. Blaine, 336 Md. 49, 64, 646 A.2d 413 (1994); Kaczorowski v. Mayor & City Council of Baltimore, 309 Md. 505, 514–15, 525 A.2d 628 (1987); Lemley v. Lemley, 102 Md.App. 266, 290, 649 A.2d 1119 (1994). See also Lincoln National Life Insurance Co. v. Insurance Commissioner of the State of Maryland, 328 Md. 65, 77–78, 612 A.2d 1301 (1992) (legislative history should not be treated "like the use of parol evidence in the interpretation of a contract").

S.G. § 10–503(b) was added to the Act in 1991. See 1991 Md. Laws, ch. 655. As originally proposed in Senate Bill 170, the subsection would have stated: "The provisions of this subtitle apply to a public body when granting a license or permit or making a land use decision." (Emphasis added). The Senate Economic and Environmental Affairs Committee received numerous objections to the proposed language, essentially claiming that the bill would chill debate among members of zoning and licensing boards, would hamper their decision-making processes, and would intrude upon "sensitive" land acquisition matters. Subsequently, the bill was amended to provide, as it does today, that the Act applies to a public body when meeting to consider the granting of a license or permit or "a special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, or any other zoning matter."

The enacted language is more restrictive than the language originally proposed. The enacted language, of course, did not fully accommodate those who objected to the original bill, as

those parties had obviously wanted zoning matters to be excluded as well. Nor did the General Assembly offer any reason in the legislative history for why it singled out "zoning matters," as opposed to other land use decisions. But this fact is of no moment; a legislature "is not required to build a record in the legislative history to defend its policy choices." *Mansell v. Mansell,* 490 U.S. 581, 592, 109 S.Ct. 2023, 2030–31 , 104 L.Ed.2d 675 (1989). The combination of the objections to the language of the proposed bill and the Legislature's subsequent decision to enact a narrower measure confirms our view that the Legislature did not intend the words "zoning matter" to cover broadly *all* land use issues.

■ Our interpretation is also supported by the concept of *ejusdem generis* ("of the same kind"). Under this principle, " 'when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned.' " *In re Wallace W.,* 333 Md. 186, 190, 634 A.2d 53 (1993), quoting *Giant of Maryland, Inc. v. State's Attorney for Prince George's County,* 274 Md. 158, 167, 334 A.2d 107 (1975). *See also State v. Sinclair,* 274 Md. 646, 658, 337 A.2d 703 (1975); *State Insurance Commissioner v. Nationwide Mutual Insurance Co.,* 241 Md. 108, 115, 215 A.2d 749 (1966). "The rule is based on the supposition that if the legislature had intended the general words to be construed in an unrestricted sense, it would not have enumerated the specific things." *State v. 158 Gaming Devices,* 304 Md. 404, 429 n. 12, 499 A.2d 940 (1985).[14]

---

**14.** In *In re Wallace W.,* for example, the Court held that the words "or property whatsoever" in a statute prohibiting the unauthorized taking and carrying away of "any horse, mare, colt, gelding, mule, ass, sheep, hog, ox, or cow, or any carriage, wagon, buggy, cart, boat, craft, vessel, or any other vehicle including a motor vehicle ... or any property whatsoever," only included property of the same class or nature as livestock or land or water vehicles, and did not include a purse taken by the defendant. *See* Maryland Code, Article 27, § 349.

In S.G. § 10–503(b)(2), the general words "any other zoning matter" follow a stream of specific terms ("special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation") that refer to *classic* zoning matters, and not general land use control tools. Because subdivision development control is distinct from zoning, it seems reasonable to conclude that the Legislature did not intend to include it within the ambit of "any other zoning matter."

The foregoing discussion convinces us that the land use control concepts of zoning, planning, and subdivision regulation, while certainly related, are nonetheless separate and distinct in the context of this case. Wesley Chapel is thus incorrect in its assertion that, for purposes of the Act, zoning "is a generic term virtually synonymous with land use law" and that zoning includes "subdivision regulations."

■■ Wesley Chapel argues that, because some of its contentions before the hearing officer and the Board involved the density of lots in the proposed subdivision, those contentions involved a "zoning matter." It relies on three Court of Appeals decisions stating that the zoning power includes the power to regulate density: *People's Counsel v. Crown Development Corp.*, 328 Md. 303, 614 A.2d 553 (1992); *West Montgomery County Citizens Association v. Maryland–National Capital Park and Planning Commission*, 309 Md. 183, 522 A.2d 1328 (1987); and *Malmar Associates v. Board of County Commissioners for Prince George's County*, 260 Md. 292, 272 A.2d 6 (1971).

In *People's Counsel*, the Court held that the circuit court had not erred by allowing the People's Counsel for Baltimore County to intervene in a case in which it was alleged that the County Review Group had allowed a developer to transfer density units from a separate tract of land, in violation of the applicable zoning regulations. The Court stated that the "People's Counsel has been given a broad charge to protect the public interest in zoning and related matters" and that "[d]ensity is an important part of the zoning process." *Id.,*

328 Md. at 317, 614 A.2d 553. In *West Montgomery,* the Court stated that "the regulation of density and distribution of population is a part of the zoning power." 309 Md. at 194, 522 A.2d 1328. The Court stated in *Malmar* that "zoning to regulate density is a proper exercise of the police power." 260 Md. at 310, 272 A.2d 6.

Wesley Chapel did not allege that the density in the proposed subdivision violated zoning regulations. Instead, it raised density issues in the subdivision proceeding. The Baltimore County Zoning Regulations provide for a maximum gross density in an R.C.4 zone of 0.2 lots per acre. B.C.Z.R. § 1A03.4B(1)(b). On the 173 acre tract in issue, this translates to thirty-four permissible housing units. Brooks proposed constructing only thirty-three units. Wesley Chapel wanted the hearing officer to exercise his discretion in the subdivision approval process to reduce the density further, in order to alleviate the alleged "adverse impact" of the development.[15] Wesley Chapel also criticized the application of the County Council's Bill 113–92, because it failed to preserve and protect R.C.4 zoned sites and permitted "more density than the old RC–4."

The fact that the zoning power includes the power to regulate density does not mean that *all* issues that happen to involve density are necessarily "zoning matters." Density issues may arise in other contexts; when density issues arise in other contexts, those proceedings are not transformed into zoning matters simply because of the presence of the density issues.

## II.

Although the subdivision control and zoning processes are conceptually distinct, it is at least theoretically possible that a particular subdivision approval proceeding may involve

---

**15.** The hearing officer, in his opinion, questioned whether he had such authority. He also stated that, even if he had the authority, no density reduction was warranted because "33 lots on a tract in excess of 170 acres does not overcrowd or overwhelm the property and its environs."

a "zoning matter." In *Miller v. Forty West Builders*, 62 Md.App. 320, 489 A.2d 76 (1985), a case cited by Wesley Chapel, we construed a provision of a County Council bill that provided that its restrictions regarding residential transition areas " 'do not apply to ... [a]ny *zoning petition* prepared in accordance with ... [the pre-amended provisions] and filed prior to June 30, 1982.' " *Id.*, 62 Md.App. at 330, 489 A.2d 76, quoting B.C.Z.R. § 1B01.1–B.1.c.11 (1981, 1982 Rev.) (emphasis supplied). There, the issue was whether the submission of subdivision plans for approval constituted the filing of a "zoning petition" within the meaning of the regulation. We held that it was, saying:

> Although this case arose within the context of approval of a subdivision plan, under the Development Review and Approval Process Division of the Development Regulations of Baltimore County, ... it also involves zoning. Accordingly, we hold that the term "zoning petition" was intended to be broad enough to include subdivision plans submitted to the C.R.G. [County Review Group] for approval.

*Id.*, 62 Md.App. at 333, 489 A.2d 76. We reached this conclusion by pointing out that "[a]pproval by the C.R.G. will necessarily entail review of and compliance with the applicable zoning regulations." *Id.* The County Code required that subdivision plans contain information regarding the zoning of the property and surrounding properties, and additional information if the plan involved use of a residential transition area. *Id.* at 333–34, 489 A.2d 76. Since the plan included zoning information, and review of the plan would include verification of compliance with zoning regulations, we construed the words "zoning petition" broadly as including "the many different methods by which zoning regulations are administered," including subdivision plans. *Id.*, 62 Md.App. at 335, 489 A.2d 76.

The County Code provisions regarding development regulation also show how zoning issues may arise in the subdivision approval process. *See* Baltimore County Code § 26–169 ("Proposed development shall be in compliance with the present zoning classification on the subject property"); § 26–203(b)(5) (requiring development plan to contain the "[c]urrent

zoning of the subject property and surrounding properties, including the location of any residential transition areas"); § 26–203(b)(8) (requiring development plan to include "[p]etitions for variances, special exceptions, special hearings, Chesapeake Bay critical area variations, or request for waivers from county regulations or standards"); § 26–203(d)(20) ("[w]hen required by the zoning regulations," director of planning may require that development contain information on layout; architectural features; design of signage, lighting, and fencing; and safety features).

But even if we assume, *arguendo,* that a subdivision plan approval proceeding may also involve a "zoning matter," so as to make the Act applicable to the Board's consideration of those issues, the issues that Wesley Chapel raised were not "zoning matters." Wesley Chapel did not allege that the zoning for the subdivision site was improper. In fact, Wesley Chapel's counsel stated to the circuit court at the motions hearing that "in this case it just happens that [the development plan] does have the correct zoning." Brooks made no requests for any zoning changes. Nor were there any allegations of a proposed use or design of the development that would have violated the zoning regulations.

Wesley Chapel contended that the conservancy area for the tract was too small. B.C.Z.R. § 1A03.5B provides that, in an R.C.4 zone, "a minimum of seventy percent (70%) of the tract acreage shall be designated a conservancy area," with the balance of the tract being "the building area." Brooks's plan set aside exactly seventy percent of the tract acreage for the conservancy area. Wesley Chapel argued to the Board that seventy percent was the "minimum" and contended that the hearing officer should have required more, although the hearing officer found "no persuasive testimony and evidence offered that the 70% provided was inadequate or improper." But this argument did not allege a violation of the zoning regulation; it merely asked the hearing officer to go beyond the zoning requirements and exercise his discretion in the process of reviewing the development plan.

In addition, as we observed earlier, Wesley Chapel's contentions relating to density did not make the Board's hearing a proceeding on a zoning matter. Wesley Chapel also contended that the development could not proceed until the County Council adopted "guidelines" to implement Bill 113–92, a contention that the hearing officer rejected because it would amount to a "moratorium" on development. This is not a zoning issue either, because it did not allege an improper or unlawful use of the land in violation of a zoning regulation. We have also reviewed Wesley Chapel's contentions relating to roads and infrastructure, septic and well location, stormwater management, the content of the conservancy deed, and historical area signage, lights, noise, and compatibility, and have determined that they did not render the Board's hearing a proceeding on a "zoning matter." None of these claims alleged violations of zoning laws or regulations. Although issues of density, the size of the conservancy area, and the like, *might* be "zoning matters" in a particular case, such as where the applicable zoning regulations would be violated, that was not the situation here.

Wesley Chapel's contention that the development could not proceed until completion of certain groundwater studies also was not a "zoning matter." In support of its contention, Wesley Chapel relied on B.C.Z.R. § 1A03.5B, which provides:

Each lot in a rural cluster development shall contain its own private sewerage system and water system and each such system shall be located within the lot. If the Director of Environmental Protection and Resource Management finds that a lot cannot support a proposed dwelling unit without endangering the potable water supply, endangering the metropolitan district, reservoirs, or creating a health or environmental nuisance of neighboring properties, a dwelling unit is not permitted on such lot.

Wesley Chapel contended that the second sentence of this regulation imposed upon the Director of Environmental Protection and Resource Management the obligation to perform groundwater tests prior to approval of the subdivision development. It argued to the Board:

Clearly, if logic has any application to this process, the Hearing Examiner's hearing is the appropriate time for such determination to be made as to the final number of lots and layout of the lots proposed for the subdivision.

 * * * * * *

Therefore, it seems clear that a logical reading of this requirement *would place its application and effectiveness at the time of the Hearing Examiner's hearing,* rather than at some subsequent time in the future. The public, the citizens, and the Appellants are entitled to know the number of lots and the final layout of this proposed subdivision at the time of the Hearing Examiner's hearing, [and] not be required to conduct a search of the records at some future and subsequent date to determine how and when the subdivision may have been realigned in accordance with this Section.

(Emphasis omitted). The hearing officer disagreed with Wesley Chapel's argument, concluding as a matter of statutory construction that, although B.C.Z.R. § 1A03.5B "might mandate certain findings from the Director of DEPRM department [sic], the section does not mandate when those findings must be made."

In our view, in the context of this case, the groundwater claim was not a "zoning matter." A plain reading of B.C.Z.R. § 1A03.5B shows that it does not require that groundwater studies must be done by the time of the subdivision approval process. Rather, it says that *if* the Director of Environmental Protection and Resource Management finds that there could be a problem involving the water supply, then development is not permitted. No evidence was proffered that the Director found any such problems, and it was conceded at the time of the proceedings below that no tests had been performed. Clearly, alleging that a zoning regulation applies does not mean that the *issue* is a "zoning matter," within the meaning of the Act.

The processes for handling "zoning matters" and "subdivision development matters" are separate and distinct. *See*

Baltimore County Code, Title 26, Art. IV, §§ 26–116 to 26–135 ("Zoning") and Art. V, §§ 26–166 to 26–305 ("Development Regulations"). The presence of a zoning issue in the midst of a larger subdivision development proceeding does not transform the proceeding into a "zoning matter." Otherwise, a challenger would have to do no more than assert a frivolous claim, based on a zoning regulation, in order to transform the nature of the proceeding. The circuit court thus erred in concluding that, based on S.G. § 10–503(b)(2), the Act applied.

### III.

In its brief, Brooks asks that we reach the merits of Wesley's Chapel's challenge to the Board's decision affirming the hearing officer's approval of the development plan. Brooks raised this matter in the circuit court by filing a legal memorandum, but because the lower court voided the Board's decision due to non-compliance with the Act, it never addressed the matter. As we have observed, Brooks did not note a cross-appeal.

Brooks urges vigorously that we should decide these issues now because it "is being unduly and unnecessarily prejudiced by Baltimore County's appeal." It claims that its development plan has a "time-sensitive nature" and that the County's appeal "serves only to delay final approval of the Wesley Chapel Woods Development Plan." It adds that the County "is not a party affected by the circuit court's order to vacate the Board's approval of the development plan and remand the matter to the Board," implying that the County does not have an interest in seeing that the approval process proceed expeditiously.

In response, Wesley Chapel has filed a "motion to dismiss" Brooks's brief. Wesley Chapel did not discuss any of the issues involving the development plan in its brief. It contends that it had no notice that Brooks would raise these issues, because Brooks did not indicate that it would do so in an information report pursuant to Rule 8–205. Wesley Chapel and Brooks both filed their briefs in this Court on the same

day and, therefore, according to Wesley Chapel, it had no way of knowing that it should address these issues in its own brief. Also, Wesley Chapel asserts that, because Brooks has not cross-appealed, it has no ability to file a reply brief to respond to Brooks's contentions, and oral argument does not provide it with an adequate opportunity to argue these matters.

In the exercise of our discretion, we decline to address the merits. Because Brooks did not note a cross-appeal, Wesley Chapel has not had an opportunity to brief these issues. Nor has the circuit court considered them.

JUDGMENT REVERSED.

CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEES WESLEY CHAPEL BLUEMOUNT ASSOCIATION, MANOR AREA ASSOCIATION, HARRY AND HELEN McCARTY, ROBERT AND SYLVIA EPPIG, ROBERT AND SUE DIETER, DARLENE WELLS, KATHERINE POWERS, JAMES CURD, DAVID SMITH, ADRIENNE BURGOYNE, RANDALL STOCKETT, ALEXANDRA SECOR, AND CHARLES AND ANNETTE SHAWGO.