934 A.2d 974

**Herman MUELLER, Jr., et al.**

v.

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY.**

**No. 319, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Nov. 2, 2007.

**46**

Edward J. Gilliss (Leanne M. Schrecengost, Royston, Mueller, McLean & Reid, LLP, on the brief), Towson, for appellant.

Carole S. Demilio (Peter Max Zimmerman, on the brief), Towson, for appellee.

Panel: HOLLANDER, DEBORAH S. EYLER, and WOODWARD, JJ.

HOLLANDER, J.

In this appeal, we are asked to determine whether the Circuit Court for Baltimore County erred in reversing the

Baltimore County Board of Appeals (the "Board"), which had granted a "Petition for Variance" (the "Petition") as to an undersized waterfront lot owned by Herman Mueller, Jr. and Grace Mueller, appellants. The lot became undersized as a result of changes to Baltimore County's zoning laws.

When the Petition was filed, appellants also owned an adjoining waterfront lot that Mr. Mueller's parents had purchased in 1947, and on which they had constructed a residence in 1948 (referred to as "Lot 66" or "Property I"). The lot at issue here (referred to as "Lot 67" or "Property II"), was purchased by Mr. Mueller's parents in 1960, and has remained undeveloped. Appellants acquired the properties in 1979. In 2004, they sought a variance as to the undeveloped lot in order to construct a dwelling on it. People's Counsel for Baltimore County, appellee, opposed the Petition. After appellants prevailed before the Board, appellee sought judicial review in the circuit court. That court reversed the Board.

This appeal followed. Appellants pose the following questions:

1. Did the Board properly grant the Appellants' Petition for Variance in Accordance with the standards for undersized lots established in BCZR Section 304.1?

2. Did the Board properly grant Appellants' Petition for Variance in accordance with the BCZR Section 307 variance process?

3. Was the Board correct in finding that the doctrine of merger is inapplicable to Properties I and II?

For the reasons set forth below, we shall reverse the circuit court and remand to the Board for further proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

In 1947, Herman Mueller, Sr. and his wife, Thelma Mueller (the "elder Muellers"), the parents of appellant Herman Mueller, Jr., acquired Lot 66, located at 2606 Bauernschmidt Drive in Baltimore County (the "County"). In 1948, they construct-

ed a dwelling on Lot 66, which is used as a summer home and weekend retreat. The elder Muellers purchased the adjacent waterfront lot, Lot 67, in 1960, located at 2608 Bauernschmidt Drive. Lot 66 is approximately 8,400 square feet in area, and 50 feet wide, while Lot 67 is approximately 6,812 square feet in area and about 61 feet wide.[1]

The lots are located in Bauernschmidt Manor, a 1940 waterfront subdivision on the Turkey Point Peninsula, in eastern Baltimore County. Bauernschmidt Manor consists predominantly of single family residences built in the 1940's and 1950's, many on lots which are about 50 feet wide, and thus undersized under current zoning regulations. However, many homes in the waterfront section of Bauernschmidt Manor were constructed on multiple, contiguous lots. Lots 66 and 67 both front on Greyhound Creek, which flows into Middle River. Moreover, most of the area comprising the two lots is located within the 100–foot Chesapeake Bay Critical Area Buffer.[2]

In 1978, the two parcels were re-deeded to Thelma Mueller and her son, Herman Mueller, Jr. Then, in 1979, the deeds were transferred to appellants Herman, Jr. and his wife, Grace Mueller. Both lots were collectively known as 2606 Bauernschmidt Drive,[3] but are deeded separately. As of

1. Originally, Lot 67 was 50 feet wide, but it was enlarged by the purchase of a portion of an adjacent emergency water access lane that was no longer needed for public safety purposes.

2. Baltimore County Zoning Regulation 500.14 prohibits the Board from granting a variance within the 100 foot setback unless certain criteria are satisfied. On May 20, 2004, the Baltimore County Department of Environmental Protection & Resource Management ("DEPRM") advised the Zoning Advisory Committee ("ZAC") that development of Lot 67 "must comply with Chesapeake Bay Critical Area Regulations...." As we said in *Becker v. Anne Arundel County*, 174 Md.App. 114, 139, 920 A.2d 1118 (2007), "there are different criteria that must be met for 'ordinary' or 'general' zoning variances and critical area variances." This opinion does not address whether appellants' proposed development of Lot 67 satisfies the Chesapeake Bay Critical Area Regulations.

3. Records of the Maryland Department of Assessments and Taxation ("SDAT") were admitted in evidence at the Board hearing and show that, as of January 1, 2003, only the improved lot had a street number.

January 1, 2003, the land portion of Lot 66 was valued at $98,550, while the improvements were valued at $21,550. As of that date, Lot 67 had a "Base Value" of $5,720. During the pendency of the variance proceedings, appellant sold Lot 66.

Lots 66 and 67 conformed to Baltimore County Zoning Regulations ("BCZR") until 1970, when the Bauernschmidt Manor subdivision was re-zoned Density Residential 3.5 or "D.R. 3.5," (i.e., 3.5 units per acre). In order to construct a dwelling on a lot that is zoned D.R. 3.5, a minimum lot area of 10,000 square feet per dwelling unit is required, along with a minimum lot width of 70 feet. *See* BCZR § 1B02.3.C.1.[4]

On April 27, 2004, appellants filed their variance Petition, in which they sought permission to make Lot 67 a buildable lot. In particular, the Petition requested that the Zoning Commissioner "approve an undersized lot per Section 304 [of BCZR] with any other variances deemed necessary...."[5]

A zoning hearing was held on June 21, 2004. Thereafter, on June 23, 2004, the Deputy Zoning Commissioner granted appellants' Petition, stating, in relevant part:

### Interested Persons

Appearing at the hearing on behalf of the variance request were James Grammer, engineer from McKee & Associates, Inc., Steven Glock and Herman Mueller, the Petitioner. Silvana Wisniewski, Robert Koch and Steve Hummel appeared in opposition to the petition. Linda Clark attended the hearing as a[sic] interested citizen. People's Counsel, Peter Max Zimmerman, entered the appearance of his office in this case.

### Testimony and Evidence

---

**4.** As discussed, *infra,* the County established a comprehensive zoning scheme in 1945 and, in 1955, it passed an ordinance to "grandfather" lots that had become substandard as a result of the 1945 ordinance, allowing them to be developed under certain conditions.

**5.** In its opinion, the circuit court stated that appellants sought relief under both BCZR § 304 and § 307. The Petition refers only to § 304.

Testimony and evidence indicated that the property, which is the subject of this variance request, consists of 6,812.10 sq. ft., more or less, and is zoned DR 3.5. Mr. Grammer proffered that the subject property is a vacant lot (lot 67) of the Bauernschmidt Manor subdivision which was recorded in the Land Records of Baltimore County in 1940. Its frontage along Bauernschmidt Drive is approximately 50 ft. as are most other lots in the subdivision. See Petitioner's Exhibit 1. The Petitioner acquired one half of a 20 ft. wide emergency water access strip in 1960 that separates lots 68 and 67 and so the combined road frontage is approximately 61 ft. As such, the combination does not meet the minimum 70 ft. width required by the regulations for DR 3.5 property. The subject lot faces Greyhound Creek and widens out to approximately 70 ft. along the water. The lot contains approximately 6,800 sq. ft of area, whereas the regulations require 10,000 sq. ft. The property is served by public sewer and water.

Lot 66 is also owned by the Petitioner and is improved by a single-family dwelling. Again, its frontage along Bauernschmidt Drive is approximately 50 ft. . . .

The Deputy Zoning Commissioner proceeded to list the nearby properties as an indication of the development pattern. He noted that several were built on 50 foot lots, while others were situated on double lots. Moreover, he observed that several protestants were concerned about jeopardizing their own views of the water. Further, he stated:

Mr. Grammer indicated that the proposed home would meet all County requirements for setbacks but could not meet the area and lot width regulations. As such, he believed that the subject property qualifies under Section 304 since the lot was recorded prior to March 30, 1955, that all other requirements except area and width will be complied with, and the owner does not own sufficient adjoining land to conform to the area and width requirements. Again, in regard to the latter requirement, he noted that *lot 66 was already undersized and there would be no sense to take land from this undersized lot as this would also require a*

*variance.* In addition, he noted that the property could not meet the zoning regulations imposed upon it many years after it was laid out and recorded. This would amount to both a hardship and practical difficulty. (Emphasis added.)

The opinion continued:

### Findings of fact and conclusions of law

In regard to what was requested in terms of variance, I find that there are special circumstances or conditions existing, that are peculiar to the land or structure, which is the subject of the variance request. The subdivision was recorded in the 1940's much before the DR 3.5 regulations were imposed. I recognize that the case of *Cromwell v. Ward*, 102 Md.App. 691, 651 A.2d 424, (1995) seems to indicate that there must be some physical uniqueness in the size[,] shape or environment of the property to qualify for a variance. However, I do not believe the Court addressed the issue of old subdivisions having new zoning regulations imposed upon them. In such a case, *the imposition of the new regulations impacts the lot in the old subdivision disproportionately as compared to lots in the area laid out in accord with the regulations. I find that under these circumstances the property passes the first test and is unique. There is no way for the 50 ft. lots, which were designed before the new regulations, to meet the new 70 ft. width or area requirements. Requiring such would be a hardship and a practical difficulty.*

However, as I indicated at the hearing, I must also find that the variance can be granted in strict harmony with the spirit and intent of said regulations, and in a manner as to grant relief without injury to the public health, safety and general welfare. To me, this means that I look to the pattern of development in the immediate area to see if the old undersized lots are generally developed with single-family homes on 50 ft. lots or has the "neighborhood" been developed with double lots. In my way of thinking, *the proposed new home should be compatible with the existing neighborhood.* Said another way, allowing new homes on 50 ft. lots in neighborhoods which have been developed in

double lots would be out of place with and change the character of the neighborhood.

*I think it also important to arrive at the same result using Section 304 or the formal variance procedure. Both have been requested here. This lot meets all the criteria of Section 304.1 as it is a pre–1955 lot, the new home will meet all regulations other than lot width and area, and there is no adjoining land from which the owner could take to make the lot conform.* I distinguish the Clark's Point Road case referred to me by the protestants because the Clark's Point Road owner had three lots that could be combined to produce two lots which would meet the regulations. However, *here, lot 66 is not large enough to contribute land without creating just another variance case.*

Also, by Section 304.4, I am additionally charged with finding whether or not the proposed dwelling is "appropriate". *I find that it is "appropriate" in this case because the neighborhood has been developed with single-family homes on 50 ft. wide lots in the past. As evidenced above, I find that the pattern of development shows that most of the lots are developed as single family homes on 50 ft. lots.* I acknowledge that there are a few double lots on the edge of this neighborhood. I define the neighborhood to be the water front and water view properties shown on Petitioner's Exhibit No. 1. Just as the water front lots are generally developed as single-family homes on the 50 ft. lots, the protestants [sic] homes across Bauernschmidt Drive are not developed as double lots, but rather single-family homes on 50 ft. lots. I do not believe that allowing another single-family home on the subject lot will adversely affect the character of the neighborhood as these are already so developed....

Under the totality of the evidence, *I also find that such a variance can be granted in strict harmony with the spirit and intent of said regulations, and in such manner as to grant relief without injury to the public health, safety and general welfare.*

Finally, I understand that the protestants have enjoyed the view from across the road for many years. I understand that they would like to continue to enjoy that view. However, they have the opportunity to purchase the development rights on the Petitioner's lot as it seems that the Petitioner is ready to sell the lot. In this case the Petitioner would maintain his view to the west without an additional neighbor. It may even be possible for an agreement with Mr. Hummel and Koch to similarly restrict the development rights on their waterfront properties. However, I cannot impose such restrictions by law. This must be a matter of agreement among the Parties.

Pursuant to the advertisement, posting of the property, and public hearing on this petition held, and after considering the testimony and evidence offered by the Petitioners, I find that the Petitioners' variance request should be granted. (Emphasis added.)

Appellee filed a *de novo* appeal to the Board, which held an evidentiary hearing on February 3, 2005.[6] We turn to review the evidence adduced at the hearing.

James Grammer, a project manager for McKee & Associates, testified on appellants' behalf.[7] As a project manager, he reviewed site plans and supervised property surveys. Moreover, for a period of twenty years, he worked with the County zoning office regarding the variance and zoning process. Grammer explained that Lot 67 was created before March 30, 1955, pursuant to a validly approved subdivision; that it has access to public water and sewer service; and that it cannot be further subdivided. He claimed that, with the exception of the D.R. 3.5 area and width requirements, Lot 67 meets all BCZR height and area regulations.

Grammer described a small boat ramp on Lot 67, "near the line of division" between lots 66 and 67, which he "assume[d]"

---

6. As of the time of the Board's hearing, appellants still owned Lot 66.

7. Appellants were unsuccessful in having Grammer certified as an expert in the County variance and zoning processes.

was used by the Muellers in conjunction with their home on Lot 66. Grammer also testified that appellants placed an "aluminum shed" on Lot 67, and he acknowledged that it "straddles the property line between Lot 67 and 68[sic]. . . ." He also recognized that "some" of the properties along the waterfront, and some behind the houses on the waterfront, were constructed on double lots.

The following testimony on cross-examination is relevant:

[COUNSEL FOR APPELLEE]: Now, let's look at the adjoining property where the Muellers have their home. Just to keep the record straight, that's 2606 [Bauernschmidt Drive].

[MR. GRAMMER]: Correct.

[COUNSEL FOR APPELLEE]: Now, is 2606 and 2608 are [sic] combined, if you combine the acreage, will that meet the 10,000 square foot minimum acreage required in the D.R. 3.5?

[MR. GRAMMER]: Yes, if they were both combined.

[COUNSEL FOR APPELLEE]: Would it also meet the front yard requirement of the seventy foot, front footage requirement of seventy feet, if they are combined?

[MR. GRAMMER]: Yes.

However, Grammer maintained that, in actuality, it is not possible for Lot 67 to conform to current zoning laws by using land that is part of Lot 66, because Lot 67 "does not have sufficient adjacent land to conform to current width and area requirements." Grammer indicated that the owner of Lot 66 would then be required to seek a variance for reducing the size of that lot. He explained that Lot 66

is currently improved with a dwelling. That itself and on its own is an undersized lot. There's no ground we can acquire from it that would increase our lot to meet the minimum area or the minimum lot width of the building line, in any case, and if we did take any ground from [Lot 66], it would

just make the existing deficiencies on Lot 66, 2606 Bauernschmidt, worse.

Mr. Mueller testified that, throughout the years, Lot 66 was used primarily as "a weekend retreat," while Lot 67 was used "to play ball on, the kids went over, and ran on it." He maintained that he "never" intended to merge the two lots, which are separately deeded and taxed. Although Lot 67 is situated "to the side" of the house on Lot 66, he insisted that "it was a lot," and did not serve as a "side yard" for Lot 66.

Appellants' son-in-law, Steven Glock, has been familiar with both lots for about 30 years, as he knew the Mueller family since he was six years old. He testified that the residence on Lot 66 is used as a "weekend home." Moreover, he stated that Lot 67 was "always characterized . . . as a separate lot" and referred to as "the lot." He added: "I call it that because that's what we referred to it in the thirty years I have been familiar with the property." According to Glock, the family entertained on Lot 66, not Lot 67. He explained that "the side lot was simply, you know, a lot," where the children played ball. With regard to the shed on Lot 67, he claimed it is "very easily moved" because it is approximately "ten-by-ten," made of aluminum, and is not a permanent structure. Glock also testified that appellants used it to store a riding lawnmower, a push lawnmower, and other handtools. As to Lot 67, he claimed: "There is no boathouse. There's a section of a seawall that's open . . . It can be used to take a boat in and out."

Since the DR 3.5 zoning regulations were imposed in 1970, residences have been built on other undersized lots within the Bauernschmidt Manor community. For example, in 1972 a residence was built at 2412 Bauernschmidt (waterfront property); in 1979, a residence was built at 2311 Bauernschmidt (non-waterfront); in 1980, a residence was built at 2705 Bauernschmidt (non-waterfront); in 1986 a residence was constructed at 2308 Bauernschmidt (non-waterfront); and in 2004 a residence was built at 2508 Bauernschmidt (waterfront property). The smallest of these properties was 2705

Bauernschmidt, with an area of 7450 sq. feet.[8]

Appellee presented two witnesses. In addition, appellee presented a petition from neighbors who opposed the variance request.

Aaron Kluttz has lived at 2618 Bauernschmidt Drive since 1991. That property consists of lots 70 and 71. He acknowledged that he intended to merge his two lots.

According to Kluttz, the Muellers have always treated their two lots as one property, with no visible line of separation. When asked about appellants' use of the properties, Kluttz stated: "I know each holiday, they have a pretty large party . . . . I don't know exactly where they put their tents, but it seems like they use both areas consistently." Further, he testified: "It's just all one big yard." He added that Mr. Mueller keeps the grass on both properties "nice, keeps it all mowed." He also stated that the Muellers use Lot 67 for recreational activities, and it has a shed on it as well as a sandy "beach ramp," from which "you can launch a boat." The remainder of both lots is "straight bulkhead all the way across."

Kluttz maintained that treating appellants' two lots as one parcel would be consistent with the neighborhood, which is composed of many residences built on double lots. He also testified that on appellant's waterfront block, two other single, vacant waterfront lots are used by their respective owners as front yards, with their residences located across the street. He added that his neighbor, Perry Leventis, constructed a house in the area in the past 15 years, which he believed was built on a lot exceeding the 10,000 square feet minimum.[9]

Appellants' counsel questioned Kluttz about a residence built on an undersized lot that had been used as a side lot for

---

8. In 1983, a residence was built at 2515 Bauernschmidt, a non-waterfront property, consisting of 14,136 square feet.

9. While the record contains many SDAT records pertaining to properties located in Bauernschmidt Manor, we have not been able to locate a record pertaining to Leventis.

an existing dwelling owned by Steven Wilson. Although each of Wilson's properties exceeds 13,000 square feet in area, the property in issue lacked the 70 foot width requirement to meet current zoning regulations. Yet, a variance was granted to build a residence on the vacant lot adjoining Wilson's residence. Mr. Kluttz expressed concern that development of Lot 67 would obstruct his view of the water. Because the area is designated as a Critical Area, Kluttz was also of the view that development should be restricted in compliance with the regulations.

Ronald Wisniewski has lived at 2605 Bauernschmidt Drive, a double lot, since 1982. He conceded that he uses his own lots as "one parcel"; that his house "straddles" the lot line; and his home is "built in the center" of the two lots. Nevertheless, he explained that it is "very common" in the neighborhood for houses to be built "on double lots." For that reason, he did not believe construction on Lot 67 would be in keeping with the character of the area. Indeed, he claimed that if appellants' variance request were granted, it would be "the first house built on Greyhound Creek within the hundred foot buffer since, I guess, the Muellers built their home." He expressed concern that he would "lose [his] waterfront view" if the Petition were granted.

Wisniewski also stated:

Like I said before, we, the community association, was successful in preventing any building in the hundred foot buffer along Greyhound Creek.

You extend that map all the way up, you will see it's all woodland, all the way around. And from that section of the road there, from Bauernschmidt, that's the only view, unobstructed view, you have of that creek, and it's all undeveloped.

And the people enjoy that every day, walking through there, and seeing that view.

Once they build there, no one will even know they're on waterfront, basically, because you're going to be looking through houses.

So it not only affects my property value, my loss of view, but it affects everybody's property value.

According to Wisniewski, appellants "mostly" used their home "on weekends." He also stated that they used Lot 67 to launch and store their boat and for "outdoor activities." He also claimed that, when hosting social gatherings, appellants used Lot 67 for a variety of purposes, including parking, playing horseshoes, and playing ball, and sometimes tables were put on the line between the two lots. Mr. Wisniewski indicated that he has seen others playing on Lot 67 (i.e., people who are not members of appellants' family). Wisniewski noted that there is no line of demarcation between lots 66 and 67, and stated that "[t]he major part of sixty-seven was open. . . ."

Wisniewski explained that he contacted SDAT about the property taxes for lots 66 and 67, because he was interested in the comparison to his own. He claimed that the property taxes for Lot 67 are lower than that for Lot 66, because SDAT considered Lot 67 a "mowing property," in that it "was a lot extension or an unbuildable lot."

In a 29–page post-hearing memorandum filed with the Board on March 17, 2005, appellee raised a number of issues. People's Counsel argued that appellants failed to satisfy the requirements for a variance, including the uniqueness requirement. Moreover, appellee claimed that appellants did not show "practical difficulty," and that granting a variance would be "in direct conflict with variance law and the spirit and intent of the regulations," stating: ". . . Petitioner wants a radical deviation from the regulations in the D.R. 3.5 zone because he believes he can make more money with two separate lots."

Appellee also argued that "the merger doctrine supports denial of the Petition under BCZR 304," and that the use of the two properties over the years created a zoning merger that precluded appellants from obtaining the requested variance. People's Counsel added that the Petition "fail[ed] to

satisfy Chesapeake Bay Critical Area Standards." Further, People's Counsel asserted:

> The site was used effectively by Petitioner with his adjoining property for many years. There is nothing prohibiting Petitioner from selling both lots together, particularly since the SDAT records show both lots were acquired by Petitioner at the same time (5–11–79).... [10] It is apparent that the Petitioner intends to separate the site from lot 66 after all these years in the hope of increasing his profit. He rejects the viable alternative of selling the combined lots and improvements together, in compliance with current zoning regulations and long-standing use. But a property owner is not entitled to every use in the zone, only a reasonable use. Nor can a variance be granted to increase Petitioner's economic gain.... Meanwhile, the evidence demonstrates it is reasonable and common in this area to utilize and transfer two or more of the old lots as a single home site, particularly along the waterfront on Bauernschmidt Drive.

On July 8, 2005, the Board issued its "Opinion," granting appellants' Petition, with the caveat that any building must comply with the Chesapeake Bay Critical Area requirements, which would be addressed during the building permit process. The Board considered the variance under BCZR § 304, stating:

> Petitioners, Grace M. and Herman Mueller, Jr., requested variance relief for property located at 2608 Bauernschmidt Drive in the "Bauernschmidt Manor" subdivision, to permit a 6,812 sq. ft. lot in lieu of the minimum required 10,000 sq. ft.; to permit a lot width of 61 feet in lieu of the minimum 70 feet per § 304 of the *Baltimore County Zoning Regulations* (BCZR); and to permit an undersized lot per § 304.

After the Board reviewed the evidence, it set forth its "Discussion," as follows:

---

**10.** As noted, appellants acquired the lots from Mr. Muellers' parents. The elder Muellers did not acquire the two lots at the same time. Indeed, they built a home on Lot 66 twelve years before they acquired Lot 67.

The Board of Appeals members deliberated this request for a variance on May 4, 2005. After much discussion the members agreed on the following.

The property was developed in the early 1940's and the Muellers purchased two lots in 1947.[11] A home was built on lot 66 in 1948 that conformed to zoning requirements which were changed in 1970. *The outcome of this zoning change, to already existing properties, resulted in a legitimate nonconforming use, causing the property to become unique.* Based upon the evidence and testimony received at [the] hearing, we find that *there are special circumstances or conditions which exist that are peculiar to the land or structure that is the subject of the variance request.*

\* \* \*

While it appears from *Cromwell [v. Ward,* 102 Md.App. 691, 651 A.2d 424 (1995) ] that there must be some physical uniqueness in the size and shape or environment of the property to qualify for a variance, we believe that the court did not address *the imposition of new zoning regulations on old subdivisions. In such cases, the imposition of new regulations impacts the lots in the old subdivision disproportionately as compared to lots in the area developed after and in accordance with new regulations. We therefore find that, under these circumstances, the property passes the first test and is unique.* This subdivision was recorded in the 1940s prior to D.R. 3.5 zoning, and *denying the requested variance would result in a hardship and practical difficulty.*

As to the issues brought up in People's Counsel's memorandum:

1. Profitability, inconvenience, or preferable alternative-The Board finds that as a result of the new zoning imposed after 1950 makes these issues moot.

---

**11.** This finding is clearly erroneous but not material; the elder Muellers acquired Lot 66 in 1947, and they acquired Lot 67 in 1960.

2. The variance request does not conflict with the spirit or intent of the regulations.

3. As to the issue of "merger," *there is no mention of intent by the owner to combine the lots as one unit.* It appears through testimony by the owner that he has never considered merging the two lots as one property as further indicated by the separate tax bills.

4. As to the Chesapeake Bay Critical Area requirements, this issue will be addressed with the building permit per DEPRM [Department of Environmental Protection and Resource Management] and ZAC [Zoning Advisory Committee] comments when the owner applies for a building permit.

The Board Members also feel that the development of this lot will not harm or change the nature of the area. Denying the requested variance relief would relinquish the use of lot 67 to only expansion of the current yard of lot 66. Therefore, this Board will grant the requested variance relief and it will so order.

(Emphasis added.)

The Board issued the following Order:

**ORDERED** that the Petitioners' request to permit a 6,812 sq. ft. lot in lieu of the minimum required 10,000 sq. ft. and permit a lot width of 61 feet in lieu of the minimum 70 feet per § 304 of the Baltimore County Zoning Regulations (BCZR) be and the same is hereby **GRANTED,** with the following restrictions:

1. Compliance with the ZAC comments submitted by DEPRM [Department of Environmental Protection and Resource Management] dated may 20, 20024[sic], a copy of which is attached hereto and made par hereof;

2. Compliance with the ZAC comments submitted by the Bureau of Development Plans Review dated May 18, 2004, a copy of which is attached hereto and made a part hereof; and

3. When applying for a building permit, the site plan filed must reference this case and set forth and address the restrictions of this Order.

Thereafter, on July 15, 2005, appellee filed a "Petition for Judicial Review." Appellants sold Lot 66 sometime during the Fall of 2005, and the new owner recorded title on December 15, 2005. Following a hearing on January 9, 2006, the circuit court reversed the Board's decision. In a well written "Memorandum Opinion" and "Judgment Order" dated January 25, 2006, the court said, in part:

In this case, the properties at issue were re-zoned in 1970 in a manner that increased the minimum lot size and width. Further construction was thereby limited, unless parties owned adjacent parcels or a variance was obtained. Testimony established that many, if not most, of the homes originally constructed in the subdivision are now on lots construed to be undersized, based upon the re-zoning. New construction has occurred within the subdivision on double lots, in compliance with the new zoning restrictions.

\* \* \*

The decision of whether to grant a variance under either provision [of the BCZR] is a two-step process. The first requires a determination of whether the property, in and of itself, is "unique and unusual in a manner different from the nature of surrounding properties such that the uniqueness and peculiarity of the subject property causes the zoning provisions to impact disproportionately upon that property." *Cromwell v. Ward,* 102 Md.App. 691, 694 [651 A.2d 424] (1995). If that "uniqueness" does not exist, no variance may be granted. If it does, then the second hurdle is to determine whether practical difficulty and/or unreasonable hardship result from the disproportionate impact of the zoning ordinance caused by the property's unique quality. *Cromwell, supra* at 694–695 [651 A.2d 424].

\* \* \*

The Board found, and the [appellants] currently argue, that application of the new zoning in 1970 disproportionately impacts undeveloped lots in the old subdivision, such as the Muellers, and that alone suffices for a finding that the property is "unique." Additionally, the [Muellers] cite to the testimony of their expert, James Grammer, who notes that Lot 67 would be rendered unusable for residential purposes if the variance were not granted.

This analysis ignores the requirements under *Cromwell* that the impact on the property at issue be somehow different from that of surrounding properties. In fact, the impact here is the same as to every undeveloped lot in the subdivision. Construction of that fact, alone, as rendering a property "unique" would effectively gut the impact of the rezoning. Every undersized lot throughout the community would then be able to claim it was unique on the basis of the re-zoning alone, and the increased lot size restrictions would be virtually meaningless.

*B. C.Z.R. affords some limited relief to property owners like the Muellers who own undersized lots in older subdivisions. By its express terms, however, relief under B. C.Z.R. 304.1 is not permitted if the owner has sufficient adjoining land to conform with the area and width restrictions set forth in the applicable zoning. At the time these matters were before the Board, the combined lots permitted construction of one residence that met with the regulations. It would be contrary to the intent of this regulation, and to the zoning modification overall, to allow construction of a second structure on this same site.*

The requested variance must fail for other reasons as well. At the time this case was before the Board, the Muellers owned Lots 66 and 67, which are contiguous. This fact is also crucial to the variance analysis.

*The doctrine of merger has developed in zoning analysis to allow consideration of the lot sizes of contiguous parcels with common ownership, where development on a single*

*parcel would violate the zoning restriction.* This doctrine of merger was first formally recognized in Maryland in *Friends of the Ridge, supra,* at which time the Court of Appeals held that a landowner who clearly desires to combine or merge several parcels of lots of land into one larger parcel may do so to allow consideration of the contiguous lots in service of a single structure or project. In reaching this conclusion, the Court noted a split in the approach to merger employed in other jurisdictions. The majority required some evidence, often minimal, of the owner's expression of intent to merge the parcels. However, some jurisdictions presume merger automatically. In *Friends of the Ridge, supra,* the court was not required to determine which of these approaches Maryland should follow.

In *Remes v. Montgomery County,* 387 Md. 52 [874 A.2d 470] (2005), the Court of Appeals further explored the doctrine of zoning merger. In *Remes,* the Court held that two contiguous lots held in common ownership that were used by prior owners in service to one another had merged for zoning purposes. Thus permits could not be issued to permit construction on the vacant lot, where such construction would create a non-conforming use on the adjacent lot. As the Court noted, when zoning merger occurs, the lots remain divided, and the doctrine simply operates as an adjustment of zoning requirements. *Remes* at 478. However, once that occurs, one can't later sell off a parcel without correcting nonconformance issues and simply seek a variance. To hold otherwise would allow the original owner to "flip-flop between his or her adjacent parcels, thwarting the intent of the land development regulations and, perhaps more egregiously skirting [the] County's exacting requirements for subdivision." *Remes* at 489.

*At the time the Board considered the Mueller's [sic] variance request, they had adjacent parcels. The undeveloped parcel had been used in combination with the developed parcel for over 40 years.* The dock used by the family was on the undeveloped lot, and a shed straddled the property line. While never formally "merged" into a single

deed, the properties had shared a common address for many years. *The double lot had sufficient area to comply with the revised zoning restrictions.* To allow the owners to now claim they are entitled to a variance to permit construction of a home on the undeveloped parcel would be contrary to the analysis employed by the Court in *Remes.*

Finally, the [Muellers] argue that the December sale of [Property I], leaving them owners of only the undeveloped lot, eliminates the merger analysis. This argument must fail for several reasons. First, in the posture of this case, this Court is bound to analysis of the facts and issue [sic] before the Board. *To the extent that new facts develop that may impact on the Board's analysis, the proper remedy is to remand for further review, not to analyze those facts in the first instance on appeal.* Second, in the analysis under B.C.Z.R. 304. 1, at the time of application the Muellers owned adjoining land. Thus this development is not one that this Court may consider in the first instance as according a basis for relief by grant of a variance.

* * *

For the reasons stated, the Court finds that the July 8, 2005 decision of the Board of Appeals was premised on an erroneous interpretation of the law, and thus was in error. For that reason, the decision of the Board of Appeals is REVERSED, and this case is remanded for an entry of a ruling consistent with the ruling set forth in this opinion. (Emphasis added.)

On February 7, 2006, appellants filed a "Motion to Alter or Amend Judgment," which was denied on March 9, 2006. The court said: "For the reasons previously stated, this Court does not believe BCZR 304.1 authorized the relief granted below."

## DISCUSSION

### I.

"The very essence of zoning is territorial division [of land within a jurisdiction] according to the character of the

land and the buildings, their peculiar suitability for particular uses, and uniformity of use within the zone." *Heath v. Mayor and City Council of Baltimore,* 187 Md. 296, 305, 49 A.2d 799 (1946). *See Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981); *Northwest Merchants Terminal v. O'Rourke,* 191 Md. 171, 60 A.2d 743 (1948); *Applestein v. Baltimore City,* 156 Md. 40, 143 A. 666 (1928); *Baltimore County v. Wesley Chapel,* 110 Md. App. 585, 602, 678 A.2d 100, *rev'd on other grounds,* 344 Md. 52, 684 A.2d 1327 (1996). The power to zone is a legislative function. *Anne Arundel County v. McDonough,* 277 Md. 271, 283, 354 A.2d 788 (1976); *Nottingham Village, Inc. v. Baltimore County,* 266 Md. 339, 350, 292 A.2d 680 (1972); *Board of County Comm'rs for Prince George's County v. Edmonds,* 240 Md. 680, 215 A.2d 209 (1965). The authority stems from the State's police power to regulate in the interest of the general welfare. *See Maryland–National Capital Park & Planning Comm'n v. Mayor of Rockville,* 272 Md. 550, 560, 325 A.2d 748 (1974); *Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 65–66, 254 A.2d 700 (1969); *American Oil Co. v. Miller,* 204 Md. 32, 39, 102 A.2d 727 (1954). *See also Euclid v. Ambler Realty Co.,* 272 U.S. 365, 387, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

 At least one function of zoning is "to preserve various types of neighborhoods, be they residential, industrial, commercial or historical." *Montgomery County v. Horman,* 46 Md.App. 491, 497–98, 418 A.2d 1249 (1980). Zoning and planning are separate functions, however. *Howard Co. v. Dorsey,* 292 Md. 351, 361, 438 A.2d 1339 (1982); *Board of County Comm'rs of Carroll County v. Stephans,* 286 Md. 384, 389, 408 A.2d 1017 (1979). Planning is a broader concept, encompassing the development of a community and the creation of "goals for orderly growth and development including the establishment of viable neighborhoods for which it delineates appropriate boundaries," and "suggest[ing] methods for implementation and achievement of those goals, including proposals for future land use and zoning classifications." *Dorsey,* 292 Md. at 362, 438 A.2d 1339. *See Washington County Taxpayers Assoc., Inc. v. Board of County Comm'rs,* 269 Md.

454, 455–56, 306 A.2d 539 (1973) ("planning embraces zoning, in a general way, but the converse is not true"); *see also* 1 E. Yokley, *Zoning Law and Practice* §§ 1–2 (4th ed.1978) (noting that "zoning is almost exclusively concerned with use regulation, whereas planning is a broader term and indicates the development of a community. . . ."); 101A C.J.S. *Zoning and Planning* § 5 (1979) (" 'Planning' contemplates the evolvement of an overall program or design of the present and future physical development of the total area and services of an existing or contemplated municipality, while 'zoning' is part of an end result or product of planning").

The first zoning regulations in Baltimore County took effect on January 2, 1945, "when, pursuant to previous authorization by the General Assembly, the County Commissioners adopted a comprehensive set of zoning regulations." *McKemy v. Baltimore County*, 39 Md.App. 257, 259, 385 A.2d 96 (1978). Then, on March 30, 1955, the County adopted "a new set of comprehensive zoning regulations." *Id.* at 260, 385 A.2d 96. However, it also enacted BCZR § 304 to "grandfather" lots that had become substandard as a result of the zoning law, allowing them to be developed under certain conditions. BCZR § 304 was intended to mitigate the harsh effect of the zoning scheme, and to avoid constitutional takings violations. The County sought to balance the expectancy interests of landowners who, in the 1940's and 1950's, may have intended to build on land that was later affected by the zoning scheme, and the long-term interests of the County in protecting against over-development and overcrowding.

In 1970, the zoning ordinance was amended again to add area and density provisions to its zoning scheme for the purpose of improving the health, safety, and general welfare of its citizens. At that time, the present minimum width and minimum area requirements were established. The ordinance was amended again in 1991 to add a "compatibility review" to the process, requiring a landowner who seeks a building permit to show that the proposed dwelling is appropriate to the neighborhood.

 " 'A variance is an authorization for [that] ... which is prohibited by a zoning ordinance....' " *Cromwell v. Ward,* 102 Md.App. 691, 699, 651 A.2d 424 (1995) (citation omitted). The burden is on the applicant to show facts to warrant a variance. *Easter v. Mayor and City Council of Baltimore,* 195 Md. 395, 400, 73 A.2d 491 (1950). In general, "the specific need for the variance 'must be substantial and urgent and not merely for the convenience of the applicant[.]' " *Chesley v. City of Annapolis,* 176 Md.App. 413, 432, 933 A.2d 475 (2007) (quoting *Belvoir Farms Homeowners Ass'n, Inc. v. North,* 355 Md. 259, 276, 734 A.2d 227 (1999)). Ordinarily, a variance is warranted if the " 'applicable zoning restriction ... is so unreasonable as to constitute an arbitrary and capricious interference with the basic right of private ownership,' " or otherwise results in "unwarranted hardship." *Belvoir Farms,* 355 Md. at 276, 282, 734 A.2d 227 (citation omitted).

Writing for this Court in *Cromwell,* 102 Md.App. at 694, 651 A.2d 424, Judge Cathell explained that the variance process "is at least a two-step process." He stated, *id.* at 694–95, 651 A.2d 424:

> The first step requires a finding that the property whereon structures are to be placed (or uses conducted) is—in and of itself—unique and unusual in a manner different from the nature of surrounding properties such that the uniqueness and peculiarity of the subject property causes the zoning provision to impact disproportionately upon that property. Unless there is a finding that the property is unique, unusual, or different, the process stops here and the variance is denied without any consideration of practical difficulty or unreasonable hardship. If that first step results in a supportable finding of uniqueness or unusualness, then a second step is taken in the process, i.e., a determination of whether practical difficulty and/or [1] unreasonable hardship, resulting from the disproportionate impact of the ordinance *caused by* the property's uniqueness, exists. Further consideration must then be given to the general purposes of the zoning ordinance.

Noting that a variance is often confused with a special exception, the Court observed, *id.* at 699–700, 651 A.2d 424: "[T]he variance and exception are designed to meet two entirely different needs. The variance contemplates a departure from the terms of the ordinance in order to preclude confiscation of property, while the exception contemplates a permitted use ... [once] the prescribed conditions therefore are met." (Citation omitted.) Moreover, the Court stated: "The general rule is that the authority to grant a variance should be exercised sparingly and only under exceptional circumstances." *Id.* at 703, 651 A.2d 424 (citation omitted).

## II.

We turn to review the zoning regulations pertinent here. BCZR § 304 is titled "Use of Undersized Single–Family Lots." The first part, § 304. 1, sets out threshold criteria for eligibility, stating:

Except as provided in Section 4A03, a one-family detached or semidetached dwelling may be erected on a lot having an area or width at the building line less than that required by the area regulations contained in these regulations if:

A. Such lot shall have been duly recorded either by deed or in a validly approved subdivision prior to March 30, 1955;

B. All other requirements of the height and area regulations are complied with; and

C. The owner of the lot does not own sufficient adjoining land to conform to the width and area requirements contained in these regulations.

If the threshold requirements of BCZR § 304.1 have been met, the inquiry proceeds to the "compatibility review" outlined in BCZR § 304.2, captioned "Building Permit Application." It provides, in part:

A. Any person desiring to erect a dwelling pursuant to the provisions of this section shall file with the Department of Permits and Development Management, at the time of application for a building permit, plans sufficient to

allow the Office of Planning to prepare the guidelines provided in Subsection B below. Elevation drawings may be required in addition to plans and drawings otherwise required to be submitted as part of the application for a building permit. Photographs representative of the neighborhood where the lot or tract is situated may be required by the Office of Planning in order to determine appropriateness of the proposed new building in relation to existing structures in the neighborhood.

B. At the time of application for the building permit, as provided above, the Director of the Department of Permits and Development Management shall request comments from the Director of the Office of Planning (the "Director"). Within 15 days of receipt of a request from the Director of the Department of Permits and Development Management, the Director shall provide to the Department of Permits and Development Management written recommendations concerning the application with regard to the following:

 1. Site design. New buildings shall be appropriate in the context of the neighborhood in which they are proposed to be located. Appropriateness shall be evaluated on the basis of new building size, lot coverage, building orientation and location on the lot or tract.

 2. Architectural design. Appropriateness shall be evaluated based upon one or more of these architectural design elements or aspects:

 a. Height.

 b. Bulk or massing.

 c. Major divisions, or architectural rhythm, of facades.

 d. Proportions of openings such as windows and doors in relation to walls.

 e. Roof design and treatment.

f. Materials and colors, and other aspects of facade texture or appearance.

BCZR § 307 is titled "Variances." BCZR § 307.1 provides: The Zoning Commissioner of Baltimore County and the County Board of Appeals, upon appeal, shall have and they are hereby given the power to grant variances from height and area regulations, from off-street parking regulations, and from sign regulations only in cases where special circumstances or conditions exist that are peculiar to the land or structure which is the subject of the variance request and where strict compliance with the Zoning Regulations for Baltimore County would result in practical difficulty or unreasonable hardship. No increase in residential density beyond that otherwise allowable by the Zoning Regulations shall be permitted as a result of any such grant of a variance from height or area regulations. Furthermore, any such variance shall be granted only if in strict harmony with the spirit and intent of said height, area, off-street parking or sign regulations, and only in such manner as to grant relief without injury to public health, safety and general welfare. They shall have no power to grant any other variances. Before granting any variance, the Zoning Commissioner shall require public notice to be given and shall hold a public hearing upon any application for a variance in the same manner as in the case of a petition for reclassification.[ ] Any order by the Zoning Commissioner of the County Board of Appeals granting a variance shall contain a finding of fact setting forth and specifying the reason or reasons for making such variance.

As to BCZR § 307, the *Cromwell* Court said, 102 Md.App. at 698–99, 651 A.2d 424:

The Baltimore County ordinance requires "conditions ... peculiar to the land ... and ... practical difficulty...." Both must exist. But the terms "practical difficulty" and "unreasonable hardship" are stated in the ordinance disjunctively. Thus, at least as to variances other than use variances,[1] if the property is found to be unique, the

practical difficulty standard would then apply.... However, as is clear from the language of the Baltimore County ordinance, the initial factor that must be established before the practical difficulties, if any, are addressed, is the abnormal impact the ordinance has on a specific piece of property because of the peculiarity and uniqueness of *that* piece of property, not the uniqueness or peculiarity of the practical difficulties alleged to exist. It is only when that uniqueness is first established that we then concern ourselves with the practical difficulties (or unnecessary hardships in use variance cases).

Section 4A03, entitled "Growth Management Plan for Bowleys Quarters and Back River Neck Areas," is similar to BCZR § 304, except that it applies to residential property "located in the Bowleys Quarters and Back River Neck areas...." *See* § 4A03.2. But, § 4A03 imposes two additional requirements: (1) the property must meet the criteria for a variance under BCZR § 307; and (2) the property must have access to public sewer service.[12]

Under § 4A03.1, an undersized lot is defined as follows: "An unimproved platted lot or a lot of record on or before August 6, 1999, that does not meet the area, height or setback requirements in these Zoning Regulations to allow the construction of a dwelling." Section 4A03.4 is titled "Building permits." Section 4A03.4.B provides:

---

12. Appellants state that BCZR § 4A03 "applies to Lot 67 because the property is in the Back River Neck Area." The Board made no such finding, however. Indeed, in its opinion, the Board only mentioned § 4A03 in its "Testimony" section, as follows:

Mr. Grammer testified [that i]n 1948 lot 67 did meet the zoning requirements for building a home. He also opined that the subject lot did meet the other requirement regarding the height and area as required under § 304.1B and § 4A03B.

Moreover, appellee does not appear to argue that § 4A03 applies here; the section is not included in its appendix of zoning regulations, nor does it cite to the section in its brief. The circuit court addressed that section, but stated that the Muellers sought relief under BCZR §§ 304 and 307.

A building permit may be issued for the construction of a dwelling on an undersized lot subject to the following conditions:

1. The owner of the lot does not own sufficient adjoining land that if combined with the adjoining land would allow the property owner to conform to the current zoning requirements;

2. No further subdivision of the lot is allowed;

3. The property owner obtains a variance as provided in Section 307 of these Zoning Regulations; and

4. The property owner connects to a public sewer where available and with adequate capacity.

BCZR § 4A03.5.B contains the same site design and architectural design requirements as set forth in BCZR § 304.2.B.

As noted, the majority of the land comprising lots 66 and 67 is located within the 100–foot Chesapeake Bay Critical Area Buffer. Baltimore County Code § 33–2–401 bars construction within that buffer unless a variance is granted in accordance with the Chesapeake Bay Critical Area criteria. BCZR § 500.14 prohibits the Board from rendering any decision on a petition for special exception or a variance within the Chesapeake Bay Critical Area setback unless:

[T]he Zoning Commissioner has received from the Director of the Department of Environmental Protection and Resource Management, or his designated representative, written recommendations describing how the proposed request would:

A. Minimize adverse impacts on water quality that result from pollutants that are discharged from structures or conveyances or that have run off from surrounding lands;

B. Conserve fish, wildlife and plant habitat; and

C. Be consistent with established land use policies for development in the Chesapeake Bay Critical Area which accommodate growth and also address the fact that, even if pollution is controlled, the number,

movement and activities of persons in that area can create adverse environmental impacts.

BCZR § 104.1 concerns nonconforming uses. It states:

A nonconforming use (as defined by Section 101) may continue except as otherwise specifically provided in these regulations, provided that upon any change from such nonconforming use to any other use whatsoever, or any abandonment or discontinuance of such nonconforming use for a period of one year or more, the right to continue or resume such nonconforming use shall terminate.

## III.

Appellants claim that the Board properly applied the requirements of BCZR § 304.1 in granting their Petition for undersized lot relief. In their view, the Board's decision "was based on substantial evidence within the record that the Appellants met all of the requirements . . ." of that section. Therefore, they urge us to reverse the circuit court.

According to appellants, BCZR §§ 304.1 and 307 are "independent methodologies available to obtain authority to build a residence on an undersized lot." They explain: "Section 304.1 is simply an undersized lot provision, which is an alternative methodology to the much more general Section 307 variance process." Moreover, appellants contend that they satisfied the criteria of § 304. 1, which does not require a determination that a property is unique and unusual in a manner different from the nature of the surrounding properties. Rather, appellants argue that § 304.1

allows for the construction of a residence on an undersized lot if three elements are met: (A) the subdivision was created prior to March 30, 1955; (B) other height and area regulations are satisfied; and (C) insufficient adjoining land is available. *Importantly, nowhere does Section 304.1 require application of Section 307's standards.*

(Emphasis added.)

Appellants maintain that the circuit court "correctly accepted that elements A and B [of § 304.1] were established," but

"refused to recognize the substantial evidence presented by the Appellants that Property II does not have sufficient adjoining land in order to conform to the current zoning regulations." They posit: "The Appellants could not simply 'borrow' land from the already developed, undersized Property I in order to make Property II of lawful size so as to permit construction of a residence. As stated by Mr. Grammer, the effect would only have been to require a variance for the existing, developed Property I."

In any event, appellants argue that the Board properly found Lot 67 unique, a factor under BCZR § 307, based on the imposition of new zoning regulations on an old subdivision.[13] Urging this Court to affirm the Board, appellants state: "Finding lawfully created lots that pre-dated zoning to be 'unique' is appropriate." In appellants' view, Lot 67 "is disproportionately impacted as compared to properties in other subdivisions or communities that were subdivided consistent with the requirements of D.R. 3. 5. . . ." Moreover, they argue that the *Cromwell* decision "never suggests that in determining whether a property is unique, it must be compared only to those properties within its immediate vicinity." Appellants assert that, "[b]y focusing solely on the Bauernschmidt Manor subdivision," the court "did not take into account . . . that the D.R. 3.5 zoning regulations affect a much broader area than just Bauernschmidt Manor."

In addition, appellants maintain that the Board was legally correct in determining that, without a variance, practical difficulty will result. According to appellants, "Property I, an undersized and developed lot, did not afford Appellants adequate adjoining land to make the non-conforming Property II 'conforming.'" They suggest that, if they are not granted a variance, Lot 67 "will have to remain vacant," rendering it "essentially worthless as compared to Property I or any other developed property in the same subdivision." Based upon the

---

**13.** As noted, the circuit court disagreed. It concluded that Lot 67 is not unique because the impact of the zoning regulations has the same effect on "every undeveloped lot in the subdivision."

alleged "economic harm" that would accrue to appellants if they are not granted a variance, appellants ask this Court to find that strict compliance with the zoning regulations will result in practical difficulty.

Further, appellants maintain that the Board correctly found that a variance would not violate the spirit and intent of the sixty-year old community, which is substantially developed. They point out that twenty-three of the properties on Bauernschmidt Drive were developed prior to the enactment of D.R. 3.5 regulations, and were constructed on what are now undersized lots. Appellants also allege that, since the enactment of D.R. 3.5 zoning in 1970, structures have been built on undersized lots on five occasions. Therefore, they insist that granting their request would not injure the public health, safety, or welfare of the community.

Appellants also contend that, in addition to meeting all three requirements of § 304. 1, they satisfied the additional requirements set forth in § 4A03.4B. In this regard, they note that the properties cannot be further subdivided, and Property II has access to public water and sewer.

In addition, appellants insist that they "should not be barred from obtaining County permission to construct a home on Property II simply based on the fact that they sold Property I." They insist that they did not "create" a hardship as to Lot 66. Appellants also contend that "the record lacks any evidence demonstrating that the doctrine of merger applies."

People's Counsel suggests that Lot 67 does not qualify for relief under BCZR § 304 or BCZR § 307. Claiming that the Board erred "on every legal issue," appellee asserts: "[C]ontrary to the [Board's] Opinion, a variance must stand on its own merits under the *Cromwell* standards for uniqueness and practical difficulty and under BCZR 307. Alternatively, the property must qualify for undersized lot relief under BCZR 304. There is no evidence to support relief under either scenario." In appellee's view, the Board's "decision is inadequate in form and substance. It lacks even a minimal analysis of the facts and application of the law required under the

fairly debatable standard for judicial review." Among other things, argues appellee, the Board ignored the evidence that, over the years, Lot 67 was utilized as a side yard for Lot 66, as well as the fact that other dwellings were constructed on double lots in the subdivision.

According to appellee, the Board's "most serious" mistake concerned its finding as to uniqueness, and "the justification of a variance based on the imposition of D.R. 3.5 zoning in 1970." Appellee explains:

The implications of this premise turn upside down long standing [sic] zoning principals [sic] on reclassification, variance, and nonconforming use. There is no authority to expand the definition of uniqueness to include a condition unrelated to the geographic features of the site or improvements. Further, the [Board] interjects a standard—size—that is not contemplated by the definition of uniqueness cited in *Cromwell v. Ward* 102 Md.App. 691 [651 A.2d 424] (1995). It also grants a prohibitive increase in density under the variance statute, B.C.Z.R. 307. This misinterpretation in turn conflicts with the limited and conditional statutory relief afforded undersized lots under B.C.Z.R. 304.1. It also seriously usurps and undermines the legislation [sic] authority of the Baltimore County Council under Md. Ann.Code, Art. 25A(X) to rezone residential property, including the concomitant increase in minimum lot size. Finally, the legal errors expand nonconforming uses, a violation of longstanding zoning principles to reduce or restrict such uses.

\* \* \*

If the variances are granted here, it creates instability for residential reclassifications that seek to reduce density by increasing minimum lot size. There are 6 D.R. classifications and 8 Resource Conservation (R.C.) zones, each with varying densities per acre. If a variance is granted to reduce lot area, it effectively supercedes a site's zoning classification, which in turn collapses the comprehensive

zoning authority of the County Council under Md. Ann. Code, Art. 25A(X).

Insisting that there was "no evidence of uniqueness causing practical difficulty to prevent a reasonable use," appellee contends that the Board "foisted its own standard for uniqueness," and "disguised its errors by giving lip service to legitimate variance standards...." Appellee elaborates, asserting that a finding of uniqueness "must relate to conditions on the land itself." Thus, appellee contends that the Board "illegally expand[ed] a reasonable use standard for practical difficulty to include the petitioner's preferred uses."

Moreover, People's Counsel claims that the Board's decision "has the disturbing side effect of extending and expanding a nonconforming use, contrary to conventional zoning principles to eliminate such uses." Appellee comments:

> In adopting a conflicting and unauthorized standard for definition of uniqueness, the [Board] acted illegally and exceeded its authority. The impact on statutory construction and administrative and zoning law is seismic. In addition to subverting the Charter authority of the County Council, the decision violates the traditional definition of uniqueness, which must relate to the conditions on the land itself. *Cromwell, supra.*

Similarly, appellee maintains that the Board's "assessment of practical difficulty is woefully inadequate and insufficient under the legal standard of review...." Appellee argues:

> Even if practical difficulty is an issue here, the variances must be denied because the characteristics of the site do not prohibit a reasonable use in conjunction with lot 68 [14] and consistent with other uses in the neighborhood. Appellants may desire a second dwelling as a different use now, but that is not the standard for practical difficulty.

Further, appellee argues that "a variance cannot be granted for a perceived economic advantage. Zoning principles have

---

14. We assume appellee meant Lot 66.

long rejected variance relief based on convenience and profitability for the property owner." Appellee continues:

The decision gives protective non-conforming status to a use that did not exist when the new law became effective. In other words, when D.R. 3.5 was applied to the site, lot 67 was used as a side yard for the dwelling on lot 68[sic], not for a second dwelling. The [Board's] decision gives a type of "retroactive" nonconforming use for a dwelling on lot 67 as a justification for variance relief.

In addition, appellee maintains that BCZR § 304 does not apply. Appellee explains:

Variance relief cannot conflict with this statute. Zoning regulations are not like a smorgasbord. BCZR 307 must be applied harmoniously with BCZR 304. It is contradictory and arbitrary to grant a variance for lot **size**, if BCZR 304[.1](c) prohibits the same relief. Unfortunately, the [Board] ignored the proper application [of] BCZR 304(c), which is not intended to permit every use, or maximize the owner's profits, but rather assure some use.

(Emphasis in original.)

People's Counsel also maintains that the Board's decision is "legally flawed in the interpretation and application of the merger doctrine[.]" According to appellee, the owner of two adjoining parcels need not state an intention to merge the properties in order for merger to occur. In appellee's view, "construction of a second dwelling is a *de facto* illegal expansion or change of a nonconforming use under BCZR 104.1.... If the relief is granted, both lots 67 and 68 [15] are nonconforming uses, contrary to the policy to eliminate, not increase, such uses."

Finally, People's Counsel complains that the requested variance violates Chesapeake Bay Critical Area standards, stating:

The Critical Area Regulations, enacted in 1988, prohibit new construction within the 100 ft[.] buffer of tributaries that flow into the Chesapeake Bay. It is significant that no

---

15. We assume appellee meant to say lots 66 and 67.

new construction has been permitted along the waterfront here, including Grey Hound Creek in this area, since the enactment of the Critical Area Law. E.39. Petitioner's request would be the first new house built along the water on Bauernschmidt Drive, except for 2515 Bauernschmidt, a 14,134 sq ft double lot, built in 1983 prior to the critical area law. E.39. B.C.Z.R. 500.14 imposes standards and findings to be made by the [Zoning Commission or Board] applicable to all zoning petitions in the Chesapeake Bay Critical Area. The [Board] completely ignored this provision and made no such findings:

"As to the Chesapeake Bay Critical Area requirements, this issue will be addressed with the building permit per DEPRM and ZAC comments when the owner applies for a building permit." Opinion p. 6.

## IV.

We review the final decision of the Board, rather than the circuit court, in accordance with the well established principles of administrative law. *See, e.g., People's Counsel for Baltimore County v. Surina,* 400 Md. 662, 681, 929 A.2d 899 (2007); *Board of Physician Quality Assurance v. Mullan,* 381 Md. 157, 165, 848 A.2d 642 (2004); *Mastandrea v. North,* 361 Md. 107, 133, 760 A.2d 677 (2000). Our role is the same as that of the circuit court. *Capital Commercial Props., Inc. v. Montgomery County Planning Bd.,* 158 Md.App. 88, 95, 854 A.2d 283 (2004). We review the administrative agency's adjudicatory decision to determine "if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Noland,* 386 Md. at 571, 873 A.2d 1145 (citing *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994)). *See Total Audio–Visual Systems, Inc. v. Dep't of Labor,* 360 Md. 387, 394, 758 A.2d 124 (2000).

A reviewing court "may not substitute its judgment for the administrative agency's in matters where purely

discretionary decisions are involved, particularly when the matter in dispute involves areas within that agency's particular realm of expertise ... so long as the agency's determination is based on 'substantial evidence.' " *Surina*, 400 Md. at 681, 929 A.2d 899 (citations omitted). *See Mullan*, 381 Md. at 164, 848 A.2d 642; *United Parcel Serv.*, 336 Md. at 577, 650 A.2d 226. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512, 390 A.2d 1119 (1978); *see Gigeous v. ECI*, 363 Md. 481, 497, 769 A.2d 912 (2001); *see Surina*, at 681, 929 A.2d 899 (same). But, "[w]e are less deferential in our review ... of the legal conclusions of the administrative body and may reverse those decisions where the legal conclusions reached by that body are based on an erroneous interpretation or application of the zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute." *Id.*, at 682, 929 A.2d 899 *(citing Belvoir Farms*, 355 Md. at 267–68, 734 A.2d 227).

Of import here, the Court of Appeals has said: " 'It is a clearly established rule in the law of zoning that a court may not substitute its judgment for that of the Zoning Board.' " *Stansbury v. Jones*, 372 Md. 172, 182, 812 A.2d 312 (2002) (citation omitted). Indeed, "the zoning agency is considered to be the expert in the assessment of the evidence, not the court." *Bowman Group v. Moser*, 112 Md.App. 694, 699, 686 A.2d 643 (1996), *cert. denied*, 344 Md. 568, 688 A.2d 446 (1997); *see also Cremins v. County Commr's of Washington County*, 164 Md.App. 426, 437, 883 A.2d 966 (2005); *White v. Spring*, 109 Md.App. 692, 699, 675 A.2d 1023, *cert. denied*, 343 Md. 680, 684 A.2d 455 (1996).

In *White v. North*, 356 Md. 31, 736 A.2d 1072 (1999), the Court of Appeals specifically elucidated the process of judicial review applicable to zoning matters:

In judicial review of zoning matters, including special exceptions and variances, "the correct test to be applied is whether the issue before the administrative body is 'fairly

debatable,' that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions." For its conclusion to be fairly debatable, the administrative agency overseeing the variance decision must have "substantial evidence" on the record supporting its decision.

*Id.* at 44, 736 A.2d 1072 (internal citations omitted); *see also Alviani v. Dixon,* 365 Md. 95, 107–108, 775 A.2d 1234 (2001); *Mastandrea,* 361 Md. at 133–34, 760 A.2d 677.

▆▆▆ In this case, the Board did not specify in its opinion the BCZR section or sections on which it relied to grant appellants' request for variance relief. However, the Board discussed several variance criteria, such as the uniqueness of the property, which is an element under BCZR § 307 and § 4A03. Nevertheless, in its Order, the Board expressly relied solely on BCZR § 304. In its analysis, the circuit court considered BCZR § 304, as well as BCZR § 307 and § 4A03. But, as we have seen, we must review the Board's decision. And, an appellate court will review an agency decision " 'solely on the grounds relied upon by the agency.' " *Schwartz v. Md. Dep't of Natural Resources,* 385 Md. 534, 555–56, 870 A.2d 168 (2005) (quoting *Brodie v. MVA,* 367 Md. 1, 4, 785 A.2d 747 (2001)). In effect, this means that the agency must be right for the right reason. Therefore, we shall focus on BCZR § 304.

## V.

▆▆▆ BCZR § 304 is a "grandfather" provision that protects a landowner from a change in the zoning laws if, *inter alia,* the lot was recorded by deed prior to 1955, or the lot was recorded as part of a validly approved subdivision prior to 1955. Although the Board (and the circuit court) discussed elements that are part of BCZR § 307, we are satisfied that BCZR § 304 controls here, rather than BCZR § 307.[16]

---

16. As the Board did not apply BCZR § 4A03, and appellee never argued that the Board erred by not applying BCZR § 4A03, we decline

In reaching our conclusion, we apply the principles of statutory construction.[17] " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature.' " *Chow v. State*, 393 Md. 431, 443, 903 A.2d 388 (2006) (quoting *Kushell v. Department of Natural Resources*, 385 Md. 563, 576, 870 A.2d 186 (2005)); *see Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 419, 918 A.2d 470 (2007). We are guided in this endeavor by the statutory text. *Reier v. State Dep't of Assessments and Taxation*, 397 Md. 2, 26, 915 A.2d 970 (2007); *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484 (2004); *Huffman v. State*, 356 Md. 622, 628, 741 A.2d 1088 (1999); *State v. Pagano*, 341 Md. 129, 133, 669 A.2d 1339 (1996). We give the words of a statute their ordinary and usual meaning. *City of Balt. Development Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 319, 910 A.2d 406 (2006); *Ridge Heating, Air Conditioning and Plumbing, Inc. v. Brennen*, 366 Md. 336, 350, 783 A.2d 691 (2001). If the statute is not ambiguous, we generally will not look beyond its language to determine legislative intent. *See Stanley v. State*, 390 Md. 175, 182, 887 A.2d 1078 (2005)(" 'Where the statutory language is free from . . . ambiguity, courts will neither look beyond the words of the statute itself to determine legislative intent nor add to or delete words from the statute.' ") (Citations omitted); *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 513–14, 525 A.2d 628 (1987).

In our effort to effectuate the Legislature's intent, we may consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Chesapeake Charter, Inc.*

to consider that provision. We note, however, that it incorporates BCZR § 307.

17. We interpret ordinances under the same canons of construction that we apply to the interpretation of statutes. *Howard Research and Dev. Corp. v. Concerned Citizens for the Columbia Concept*, 297 Md. 357, 362, 466 A.2d 31 (1983); *Ahalt v. Montgomery Co.*, 113 Md.App. 14, 25, 686 A.2d 683 (1996).

*v. Anne Arundel County Bd. of Educ.,* 358 Md. 129, 135, 747 A.2d 625 (2000) (citation omitted); *see Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994). Moreover, if " ' "reasonably possible," ' " we read a statute "so ' "that no word, phrase, clause or sentence is rendered surplusage or meaningless," ' " *Del Marr v. Montgomery County,* 169 Md.App. 187, 207, 900 A.2d 243 (2006) (citations omitted), *aff'd,* 397 Md. 308, 916 A.2d 1002 (2007), or "superfluous or redundant." *Blondell v. Baltimore City Police Dep't.,* 341 Md. 680, 691, 672 A.2d 639 (1996); *see Collins,* 383 Md. at 691, 861 A.2d 727; *Eng'g Mgmt. Servs., Inc. v. Md. State Highway Admin.,* 375 Md. 211, 224, 825 A.2d 966 (2003); *Mayor & Council of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 551, 814 A.2d 469 (2002). Further, we are obligated to construe the statute as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized. *Deville,* 383 Md. at 223, 858 A.2d 484; *Navarro–Monzo v. Washington Adventist,* 380 Md. 195, 204, 844 A.2d 406 (2004). Where "appropriate," we interpret a provision "in the context of the entire statutory scheme of which it is a part." *Gordon Family Partnership v. Gar on Jer,* 348 Md. 129, 138, 702 A.2d 753 (1997).

▬▬▬ Of import here, if there is any conflict between two statutory provisions, the more specific statute controls. *Property & Casualty Ins. Guar. Corp. v. Yanni,* 397 Md. 474, 492 & n. 15, 919 A.2d 1 (2007) ("Ordinarily, a specific enactment prevails over an incompatible general enactment in the same or another statute."). As the Court explained in *State v. Ghajari,* 346 Md. 101, 115, 695 A.2d 143 (1997), "when two statutes appear to apply to the same situation, [the] Court will attempt to give effect to both statutes to the extent that they are reconcilable." But, if there is an irreconcilable conflict, "the specific statute is controlling. . . ." *Id.* at 116, 695 A.2d 143. *See also Maryland–National Capital Park and Planning Comm'n v. Anderson,* 395 Md. 172, 183, 194, 909 A.2d 694 (2006); *Mayor of Oakland v. Mayor of Mountain Lake Park,* 392 Md. 301, 316–17, 896 A.2d 1036 (2006).

In this case, as between BCZR § 304 and BCZR § 307, § 304 is clearly the more specific statute, because it is a

grandfather provision that applies to lots that became under-sized due to changes in the zoning laws. In contrast, § 307 applies generally to all variance requests. Therefore, § 304 controls. BCZR § 304 does not contain elements of practical difficulty or uniqueness, which are embodied in § 307.

The grandfather clause of § 304 has limits, however. BCZR § 304.1.(C) provides relief only to owners who "do not own sufficient adjoining land to conform to the width and area requirements contained in these guidelines." [18] We pause to review 4 Kenneth H. Young, *Anderson's American Law of Zoning* §§ 9.66–9.67 (4th ed.1997), with regard to grandfather clauses in zoning matters:

Before the subdivision of land was subjected to municipal control, a great deal of municipal land had been divided into small lots, many with less than 30 feet of frontage and less than 3,000 square feet of space. When greater frontage and area requirements were superimposed upon this pattern, many owners were left with substandard lots. Strict and literal enforcement of the more stringent regulations would have made such lots useless to their owners and to the community. In addition, the regulations which destroyed the use value of such substandard lots would have been held confiscatory.

To avoid this result, most ordinances provide some relief for the owner of a substandard lot.... Under such an ordinance, the owner of a substandard lot which was of record prior to the adoption of the restrictive ordinance need not seek administrative relief. He is entitled as of right to develop his lot within the limits of the exception. *His right to such relief may be lost where he treats a number of lots as a single unit* for the purpose of constructing a condominium. If the determination of his qualification

---

**18.** Similarly, BCZR § 4A03.4.B. 1 limits the granting of a building permit to owners of undersized lots only if "the owner of the lot does not own sufficient adjoining land that if combined with the adjoining land would allow the property owner to conform to the current zoning requirements."

for an exception is committed to an administrative board, as is true under some ordinances,[ ] the task of the board is simply to determine whether the lot was one of record on the effective date of the ordinance. *The board is without discretion to deny a permit if the specific requirements of the ordinance are met....*

\* \* \*

*The common exception of lots which were recorded prior to the effective date of a restrictive ordinance is limited to lots which were in single and separate ownership on that date. Under such a provision, an owner is entitled to an exception only if his lot is isolated. If the owner of such a lot owns another lot adjacent to it, he is not entitled to an exception. Rather, he must combine the two lots to form one which will meet, or more closely approximate, the frontage and area requirements of the ordinance. Where, for example, a landowner held four contiguous lots which each had a frontage of 20 feet, he was regarded as owning 80 feet of frontage and was required to redivide the land consistent with the zoning regulations. This requirement was held reasonable as it permitted him some reasonable use of his land.* The same result was reached where the owner of a lot containing 5,000 square feet acquired a contiguous lot of the same size. Under the ordinance he was considered to own a lot of 10,000 square feet. However, the requirement that adjacent substandard lots be merged may be unreasonable if the lots are the same size as most other lots in the area.

(Emphasis added; footnotes omitted.)

In this case, there is no dispute that appellants satisfied BCZR § 304.1(A) and (B). The question is whether appellants satisfied BCZR § 304.1(C), which states: "The owner of the lot does not own sufficient adjoining land to conform to the width and area requirements...." As noted, the Board was of the view that there was no adjoining parcel available to appellants under the circumstances of this case. In contrast, the circuit court ruled, *inter alia,* that appellants

had a "double lot" and thus they "had sufficient area to comply with the zoning requirements." We disagree with the circuit court.

 Appellants' house was constructed on Lot 66 prior to enactment of the current area and width requirements. Lot 67 remained undeveloped and vacant. Had appellants requested a variance as to Lot 66, it is clear that appellants would have had adjoining land—Lot 67—a vacant and undeveloped lot, which could have been combined with Lot 66 so as to render Lot 66 a conforming parcel. In this case, however, we must analyze whether Lot 67 had sufficient adjoining land available to it from Lot 66 so as to create a conforming parcel on Lot 67. To the extent that the circuit court determined that appellants had an adjacent parcel to enable them to satisfy current zoning requirements, it erred.[19]

In *Cromwell*, 102 Md.App. 691, 651 A.2d 424, this Court made clear that self-inflicted hardships cannot justify a variance. There, we said, *id.* at 722, 651 A.2d 424:

Were we to hold that self-inflicted hardships in and of themselves justified variances, we would, effectively not only generate a plethora of such hardships but we would also emasculate zoning ordinances. Zoning would become meaningless. We hold that practical difficulty or unnecessary hardship for zoning variance purposes cannot generally be self-inflicted.

The Court added, *id.* at 726, 651 A.2d 424:

---

**19.** We agree with the circuit court's determination that appellants' subsequent sale of Lot 66 has no effect on our review of the issues. "[A]ppellate review of administrative decisions is limited to those issues and concerns raised before the administrative agency." *Capital Commercial Props., Inc.,* 158 Md.App. at 96, 854 A.2d 283. Moreover, "[i]t is the function of the reviewing court to review only the materials that were in the record before the agency at the time it made its final decision." *Department of Labor v. Boardley,* 164 Md.App. 404, 415, 883 A.2d 953 (2005) (citing *Chertkof v. Dep't. of Nat. Resources,* 43 Md.App. 10, 17, 402 A.2d 1315 (1979)). At the time the Board made its decision, the appellants owned both Lot 66 and Lot 67. Lot 66 was not sold until after the Board made its final decision and the appeal before the circuit court was pending.

It is not the purpose of variance procedures to effect a legalization of a property owner's intentional or unintentional violations of zoning requirements. When administrative entities such as zoning authorities take it upon themselves to ignore the provisions of the statutes enacted by the legislative branch of government, they substitute their policies for those of the policymakers. That is improper.

As we see it, however, appellants' use of Lot 66 does not give rise to a claim of self-inflicted hardship with regard to Lot 67.[20] The "typical type of self-created hardship" arises from "an act of commission by the owner" or his predecessor. *Richard Roeser Prof'l Builder, Inc. v. Anne Arundel Co.*, 368 Md. 294, 317, 793 A.2d 545 (2002). *See Stansbury*, 372 Md. at 198, 812 A.2d 312 (recognizing that subdividing property in accordance with all applicable statutes does not, generally, constitute a self-created hardship, even though the act of subdivision was an act of commission). Put another way, a self-created hardship results from affirmative "actions of the landowner," rather than from the "impact . . . of the zoning ordinance on the property." *Roeser*, 368 Md. at 314, 793 A.2d 545. *See, e.g., Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County*, 307 Md. 307, 316, 513 A.2d 893 (1986).

This case is unlike those in which the landowner took an affirmative action that resulted in the hardship. Here, the elder Muellers acquired Lot 67 several years after their residence was constructed on Lot 66. And, when they acquired Lot 67, it was a buildable lot. Neither Lot 66 nor Lot 67 was rendered nonconforming by virtue of actions taken by the elder Muellers, or appellants, *after* the zoning law in issue was enacted.

To be sure, zoning ordinances often limit grandfather clauses to lots of record that are in single or separate ownership.

---

20. Appellee does not suggest that appellants do not stand in the shoes of the elder Muellers with respect to the use of the lots. Nor has appellee argued that BCZR § 304 does not apply because Mr. Mueller acquired the lots from his parents after the enactment in 1970 of the D.R. 3.5 zoning provision.

Put another way, an ordinance may limit the grandfather clause by a provision that, in effect, merges contiguous, vacant, substandard lots under common ownership, so that they are treated as a single parcel for purposes of zoning area and frontage requirements. But, appellants correctly argue that they did not own sufficient adjoining land to enable Lot 67 to comply with the zoning ordinances. This is because, with regard to Lot 67, appellants did not own an adjoining, *unimproved* parcel. Rather, the adjoining parcel, Lot 66, was improved before the change in the zoning law. Thus, appellants could not "borrow" land from Lot 66 to enlarge Lot 67 without making Lot 66 more substandard than it already is.

Appellee cites *Board of Zoning Appeals of the City of Hammond, Lake County v. Waskelo,* 240 Ind. 594, 168 N.E.2d 72 (1960), to support its position. In our view, *Waskelo* is distinguishable from the case *sub judice.*

In *Waskelo,* the court denied a variance for property owners who voluntarily subdivided their property. At the time of the purchase of the subject property in that case, the property was one lot and conformed to the applicable zoning regulations. After the subdivision, the owners sold the improved lot and retained the remaining lot, which did not meet frontage requirements. The owners then sought a variance to construct a dwelling on the substandard lot. In that circumstance, the court refused to find a hardship to justify a variance, stating: "The property as it existed at the time of purchase conformed fully with the provisions of the zoning ordinance." *Id.* at 73. The court went on to state that the owners' decision to sell the improved portion of their property, with full knowledge of the restriction on the use of the remaining portion, is "not the result of any invalid application of terms of the zoning ordinance to their particular property, even though landowners might have been under a hardship in utilizing the portion of the lots which they retained." *Id.* at 74.

Unlike the landowners in *Waskelo,* appellants did not subdivide a conforming lot, thereby creating a substandard or

nonconforming lot. Instead, appellants' relatives purchased two lots at separate times, both of which were conforming when acquired. And, they developed the first lot years before they even purchased the second lot. As a result of rezoning, both lots became nonconforming. The creation of the nonconforming lots was not of appellants' doing, however. Thus, appellants did not create a hardship for themselves.

We find the reasoning in *Burke v. Board of Adjustment of the Borough of Spring Lake,* 52 N.J.Super. 498, 145 A.2d 790 (App.Div.1958), persuasive. There, the town of Spring Lake increased its frontage requirements for a building permit from 50 feet to 100 feet, and adopted a provision to "grandfather" current owners, which stated, in part, *id.* at 792:

'Notwithstanding the Lot Area and Lot width requirements of (the area here involved) * * *, a single family dwelling may be erected on any lot separately owned and not adjacent to any lot in the same ownership [on] the effective date of this ordinance.'

In 1946, before the new zoning ordinance was passed, the plaintiff purchased two contiguous lots, each having 50 feet of frontage. The plaintiff erected a dwelling house on one of the properties when the old zoning ordinance was in force. A year after the new ordinance was adopted, the plaintiff sought permission to erect a dwelling on the undeveloped lot, which had become undersized. The local zoning board denied her application for a variance, on the ground that the lot failed to comply with the new frontage requirements. The plaintiff appealed, arguing that, unless permitted to construct a dwelling on the property, the lot was "useless." *Id.* at 791. The trial judge concluded that the variance should be granted on the grounds of undue hardship. *Id.*

On appeal, the defendants, the Board of Adjustment of the Borough of Spring Lake and its building inspector, argued that the ordinance expressly sanctioned dwellings on 50 foot frontage lots only when " 'not adjacent to any lot in the same ownership.' " *Id.* at 792. The defendants also challenged the trial court's finding of undue hardship, arguing that the plain-

tiff caused the undue hardship. The Superior Court disagreed, stating:

> We fail to perceive ... any justification for holding that a property owner who constructs her home on a 50–foot frontage lot and who leaves *untouched* another adjoining lot with the same dimensions—all done many years before the enactment of an amendatory ordinance increasing the frontage requirements—has in any culpable sense contributed to her own hardship.

*Id.* (Emphasis added.)

Rejecting the defendants' claim that plaintiff was not entitled to relief because she owned an adjoining lot, the court upheld the award of variance. It said:

> The evident purpose of [the] provision is to allow dwellings on 50–foot frontage lots unless the owner himself has the wherewithal to make his lot comply with the new requirements, *i.e.*, adjacent property, in which event he would not need a variance, at the expense of the community-at-large. **But the exclusion of those lots 'adjacent to any lot in the same ownership' does not faithfully reflect the purpose of the provision unless it is limited to *vacant* adjacent lots. That plaintiff finds herself with the adjacent lot 17, which because of the dwelling thereon, she cannot use to make lot 16 comply is clearly no reason for denying her the benefit of the cited ameliorative provision. Realistically, the plaintiff has a house on one 50–foot lot and another vacant 50–foot lot. If she cannot build on the latter, it will be forever useless. That the two lots are adjacent does not mitigate her hardship.**

*Id.* at 793 (Italics in the original; boldface added.)

As in *Burke*, we believe the grandfather clause in § 304 was meant to limit the construction of residences on undersized lots when a landowner possesses a contiguous, *vacant* or undeveloped parcel of property. That is not the situation here, through no fault or action of appellants.

■ Appellee suggests that, even if Lot 66 has been developed, appellants are not entitled to the variance because

the two lots merged into one under merger principles. Notably, the Board rejected appellee's merger claim. The circuit court, however, agreed with appellee that, based on merger, appellants are not entitled to treat Lots 66 and 67 as distinct properties. As we discussed earlier, we may not set aside a factual finding that is "fairly debatable," i.e., "based upon evidence from which reasonable persons could come to different conclusions." *White*, 356 Md. at 44, 736 A.2d 1072. In our view, the matter is "fairly debatable," and thus the Board's finding as to lack of merger was not clearly erroneous. Accordingly, we shall not disregard it. We explain.

 Merger, in the context of land use, is the joining of contiguous parcels under common ownership, so that they are viewed as a single parcel for purposes of zoning regulations. 3 Ziegler, *Rathkopf's Law of Zoning and Planning*, § 32.04, n. 1 (1994). Zoning merger in Maryland can occur as a result of a property owner's use of contiguous lots under the same ownership. *See Friends of the Ridge v. Baltimore Gas & Elec. Co.*, 352 Md. 645, 724 A.2d 34 (1999)(recognizing existence of zoning merger).

4 Arden H. Rathkopf, et al., Rathkopf's, *The Law of Zoning and Planning*, § 49.13 (4th ed.2001), provides guidance. It states:

Zoning ordinance provisions often limit exemptions or grandfather clauses to lots of record that are in single or separate ownership. *Either implicitly by such provisions or expressly by "merger" requirements in the ordinance itself, contiguous substandard lots under common ownership may lose their separate identity and be treated as a single parcel for purposes of zoning area and frontage requirements and subdivision restrictions. Merger provisions generally have been upheld against due process, equal protection, and taking claims. The application of merger provisions when a variance is sought is often the subject of litigation and denial of a variance is frequently sustained by courts based on such provisions. Merger requirements may operate upon contiguous undeveloped lots or upon*

*contiguous lots where one or more of the lots are already developed.*

In dealing with substandard lots, as with nonconforming uses which are analogous, the point of reference is the effective date of the bylaw. The basic purpose of the ordinance provision establishing generally applicable minimum lot requirements has as its corollary the purpose to freeze and minimize substandard lots. If there is a merger provision in the ordinance, it is designed to result in a maximum number of standard lots from each separate tract of land in single ownership at the effective date of the ordinance. The number of separately described parcels which an owner or his predecessors in title may have acquired over the course of time to make up the entire tract is thus immaterial.[ ]

(Emphasis added; footnotes omitted.)

Appellee claims that, by the way in which appellants used both lots, a merger occurred. Appellee directs our attention, *inter alia,* to *Sciacca v. Caruso,* 769 A.2d 578 (R.I.2001), for the proposition that appellants "cannot 'unmerge' " their properties. In that case, Caruso held two adjacent lots, each of which met the minimum buildable lot size at the time they were acquired by her in the 1960's. The owner constructed a dwelling on Lot 91 and landscaped and placed a shed on lot 92. *Id.* at 579. Nearly twenty years later, the town amended its zoning ordinance, which increased the minimum lot size and frontage requirements. As a result, the lots did not meet the frontage or area requirements under the new ordinance. However, if combined, the lots satisfied the new regulations. In the same amendment to the zoning ordinance, the town included "a so-called merger provision,[ ] pursuant to which contiguous lot Nos. 91 and 92 merged into one lot to meet this particular residential zoning district's minimum lot area and frontage requirements." *Id.* at 579–80.[21]

---

21. The merger provision provided:
 "Contiguous lots under the same ownership. **Where no adjacent lot is in the same ownership at the time this amendment becomes**

In 1997, Caruso sought to build a dwelling on Lot 92. To "unmerge" the lots, she was granted approval to subdivide the property along its original lines. She then sought a variance from the minimum area and frontage requirement. Although several neighboring property owners objected to the variance request, it was ultimately granted by the zoning board. *Id.* at 581. The opponents then challenged that ruling in court.

Under Rhode Island statutory law, in order for a property owner to be entitled to a variance from frontage or area requirements, the owner must satisfy the zoning board "that the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience, which means that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property." *Id.* at 583 (emphasis omitted). Moreover, before a zoning board grants a variance, it must be satisfied that any hardship suffered was "not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain." *Id.* "Given this statutory language and the circum-

---

effective, so as to enable the formation of a larger lot, an existing lot shown on a plat duly recorded in the office of the town clerk prior to January 6, 1953 which fails to meet either the minimum frontage requirements or minimum area requirements, or both, of this chapter, may be used for a one-family dwelling in an R–40, R–20, R–15, R–10 and R–7 district. Where land adjacent to such a lot is in the same ownership, the exemption of the previous sentence shall not apply. If adjacent land in the same ownership is not sufficient to meet the minimum frontage requirements or minimum area requirements, or both, then the largest area and frontage which the adjoining common ownership make possible shall be provided.

"No parcel, tract or lots of land contiguous to each other and under single ownership shall be subdivided in a manner where the lot width or area shall be below the requirements fixed by this chapter. No yard, or open space provided around any building for the purpose of complying with the provisions of this chapter, shall again be used as a yard or open space for any other building.

"Nothing contained in paragraphs (a) or (b) shall be construed to exempt such lots from the side yard, front yard, and rear yard requirements of the zone in which such lots are located." Johnston Town Code § 26–16(b) (1995).

*Id.* at 580 n. 1 (italics in original; boldface added).

stances concerning how Caruso created the substandard lot that was the subject of her variance request," the Supreme Court of Rhode Island ruled that "the zoning board's grant of a dimensional variance . . . improperly ignored the 'prior action of the applicant' in creating the alleged hardship." *Id.* at 584. It continued, *id.:* "Here, the undeniable fact is that Caruso's prior action caused the planning board to subdivide her single-conforming lot into two substandard-sized parcels, thereby creating the undersized lot in question. This 'prior action' resulted in the self-created hardship that she later used as the basis for her variance request." [ ]

In overruling the zoning board, the court concluded: "To rule otherwise would allow Caruso and other similarly situated property owners to circumvent applicable zoning laws pertaining to the validity of merger provisions like those in the town's zoning ordinance, as well as to evade the threshold showing of hardship that is required to obtain relief from their application through the granting of a dimensional variance." *Id.* at 585.

We are not persuaded by *Sciacca.* The question remains whether the doctrine of merger applies here.

In *Friends of the Ridge,* 352 Md. 645, 724 A.2d 34, the property owner, BG & E, sought a declaration that three adjacent properties it owned merged for zoning purposes, so that the site was of sufficient size to allow it to enlarge an electricity substation. BG & E applied for a variance from certain setback requirements in order to operate the larger substation. The Board determined, however, that no variance was necessary. *Id.* at 648 n. 3, 724 A.2d 34. The petitioners, Friends of the Ridge, appealed, asserting that because the parcels were never legally combined, BG & E was required to obtain a variance to use the three parcels as one. *Id.* at 649, 724 A.2d 34. The Court of Appeals sustained the Board's decision that the variance criteria of BCZR did not apply, reasoning that the assemblage of contiguous parcels was sufficiently large to overcome the conditions triggering the need for a variance. *Id.* at 662, 724 A.2d 34.

With regard to the principles of merger, the Court said, *id.* at 653–54, 724 A.2d 34:

Efforts throughout the country, including Baltimore County, have been to restrict undersize[d] parcels, not oversized parcels. These efforts have resulted in the creation and evolution in zoning of the doctrine of merger, which, in zoning cases, generally prohibits the use of individual substandard parcels if contiguous parcels have been, at any relevant time, in the same ownership and at the time of that ownership, the combined parcel was not substandard.[ ] In other words, if several contiguous parcels, each of which do not comply with present zoning, are in single ownership and, as combined, the single parcel is usable without violating zoning provisions, one of the separate, nonconforming parcels may not then *or thereafter* be considered nonconforming, nor may a variance be granted for that separate parcel. Some cases discuss automatic merger, but most require that the intent of the owner to merge the parcels be expressed, though little evidence of that intent is required. As far as we can discern, the zoning doctrine of lot merger has never been applied in any jurisdiction to limit the creation of parcels that exceed minimum dimensional requirements; merger has been applied only to prohibit the later creation of undersized parcels. This, perhaps, is due to the general lack of objection to large parcels.[ ] A discussion, however, of how the doctrine of merger applies conversely to the present case may help emphasize that, in the context described above, merger occurs without the need for official subdivision or conveyancing. It is accepted automatically in some jurisdictions or, most often, with minimum proof of the owner's intent in other jurisdictions and always without the necessity of official action. We see no reason why a doctrine that seeks to prevent the proliferation or use of nonconforming, undersized lots by holding that they have been combined or merged into a larger parcel should not, as far as zoning is concerned, be applied properly to permit the creation, through the combining by use of a larger parcel from already conforming smaller

parcels, without the necessity of official action or conveyancing.

Ultimately, the Court held that "a landowner who clearly desires to combine or merge several parcels or lots of land into one larger parcel may do so." *Id.* at 658, 724 A.2d 34. Of import here, the Court said: "An owner of contiguous parcels of land *may merge those parcels to form one tract if he desires to do so.* An intent on the part of the owner to do so may be inferred from his conduct with respect to the land and the use which he makes of it. . . . **Intent is a question of fact.**" *Id.* at 659, 724 A.2d 34 (italics in original; boldface added). The Court recognized that one way for a landowner to manifest intent to merge contiguous properties is by "integrat[ing] or utiliz[ing] the contiguous lots in the service of a single structure or project. . . ." *Id.* at 658, 724 A.2d 34.

*Remes v. Montgomery County,* 387 Md. 52, 874 A.2d 470 (2005), is also pertinent. There, the Court applied the concept of zoning merger to treat two residential lots as one, even though the owner wanted to treat them separately. Ralph and Violette Duffie purchased a parcel of property in 1951 (Lot 12), located in a subdivision created in 1945. They constructed a residence on that lot. *Id.* at 57, 874 A.2d 470. Several years later the Duffies purchased an adjoining parcel, Lot 11. *Id.* Over the years, both properties had been assessed as one lot for tax assessment purposes, and the properties shared the same address. *Id.* at 58, 874 A.2d 470. In addition, the Duffies installed a driveway that traversed both lots and, in 1959, they received a building permit to construct a swimming pool on Lot 11, "as an accessory use to their home on Lot 12. . . ." *Id.* at 57, 874 A.2d 470. In 1963, the Duffies again sought a building permit to construct an addition to the residence, which resulted in an encroachment to the setback requirements on the Lot 11 side of the residence. *Id.* at 58, 874 A.2d 470.

In 1999, after the Duffies' deaths, both properties were transferred to their son by a single deed describing both properties. *Id.* On January 15, 2003, the Duffies' son executed

a deed conveying one of the two lots to Design–Tech Builders, Inc. In 2002, before it purchased the property, Design–Tech obtained a building permit to construct a single-family dwelling on the property it eventually purchased. *Id.* at 59, 874 A.2d 470. Shortly after the sale of January 15, 2003, David Remes, an owner of property adjacent to the lot purchased by Design–Tech, filed an action in circuit court seeking a declaration that the Duffies' two lots had merged for zoning purposes, and to rescind the sale to Design–Tech. *Id.* at 60, 874 A.2d 470.

The Court of Appeals held that although the properties were separately deeded, it "does not lead us to the necessary conclusion that these lots for zoning limitations are not subject to the doctrine of zoning merger." *Id.* at 80, 874 A.2d 470. The Court reiterated what it had said in *Ridge,* "that merger may be derived from the common owner's intent, as evidenced by 'integrat[ing] or utiliz[ing] the contiguous lots in the service of a single structure or project....' " *Id.* at 66, 874 A.2d 470 (citing *Ridge,* 352 Md. at 658, 724 A.2d 34).

Underscoring that "[e]ach case must be examined on its own," *id.* at 68, 874 A.2d 470, the Court said, *id.:*

> In the case at bar, there is ample evidence to conclude the elder Duffies intended to use their Lot 11 and Lot 12 as one property for zoning purposes: the pool on Lot 11 violates (or violated) the prescribed setbacks from the street and from Lot 12, unless it was dedicated for zoning purposes to Lot 12, and from the time of its creation was thus an accessory use to the structure or use of Lot 12; the additions to the house on Lot 12 encroach upon that lot's setbacks; the circular driveway traverses both Lot 11 and Lot 12; until very recently the lots were assessed for tax purposes as a single parcel; and the subsequent personal representative's deed conveying Lot 11 and Lot 12 to Mr. Duffie described a single lot comprised of two lots, in that it reads "Lot numbered eleven (11) and twelve (12)." [ ]

The Court concluded that the properties had merged for zoning purposes because they "were under common owner-

ship, and at the time of that common ownership, they were used in service to one another." *Id.* at 87, 874 A.2d 470. It reasoned that, in order for the adjacent property to be "utilized separate and apart from [the other], there would have to be a resubdivision of the combined lot, creating two lots both of which meet the requirements of both the zoning ordinance and the subdivision regulations." *Id.*

This case is distinguishable from *Remes* on its facts. Appellants made no improvements to Lot 67 of a kind that are remotely comparable to those made to Lot 11 in *Remes.* The elder Muellers acquired Lot 66 in 1947, and Lot 67 in 1960. The evidence before the Board indicated that the family's boat launch and a moveable storage shed were located on Lot 67. Mr. Mueller and appellants' son-in-law both testified that Lot 67 was generally utilized for recreational activities, such as ball playing. However, no permanent structures were erected on Lot 67, such as a swimming pool or a common driveway. Nor was Lot 67 used in service of Lot 66 in a way comparable in degree to the way that Lot 11 served Lot 12 in *Remes.* Moreover, Mr. Mueller testified that it was never his intent to merge the two properties.

To be sure, there was no physical or structural line of demarcation separating the lots. But, that is not required to preclude merger. Nor were appellants or the elder Muellers required to abstain entirely from the use of Lot 67 in order to preclude merger. If the Board were compelled to find merger on these facts, it would mean that almost any time a landowner owns adjoining and contiguous parcels, they would merge as a matter of law for zoning purposes.

On these facts, the Board was not clearly erroneous in concluding that appellants' use of Lot 67 did not create a merger. We agree with appellants, who argue:

[N]ot all uses of an adjacent undeveloped property result in a merger. It is improper and without legal foundation to suggest that Appellants' occasional recreational use of Property II caused Properties I and II to merge. If the Appellants had bought an undeveloped lot somewhere else

in the community, and "play[ed] ball" on it or placed a shed on it, such actions would never be considered merger. Moreover, the mere existence of a shed-not constructed on a foundation and not a structure for which a building permit was sought—cannot be viewed as similar to a permanent improvement benefitting the other parcel or a driveway being built across one lot to access another. The Appellants never needed the undeveloped Property II for them to enjoy the use of their developed Property I.[22]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO THE BOARD FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE.**

---

22. We note that the Board determined that Lot 67 is "unique." Although BCZR § 307 contains a uniqueness requirement, BCZR § 304 does not contain such a requirement, and the Board's Order indicates that it granted the variance pursuant to § 304. Therefore, we need not address the element of uniqueness or hardship. As noted, we may only uphold the agency on the grounds on which it relied. *See Department of Health and Mental Hygiene v. Campbell,* 364 Md. 108, 111 n. 1, 771 A.2d 1051 (2001).